**TRI-COR, INC.**

v.

**The UNITED STATES.**

**No. 486–69.**

United States Court of Claims.

April 14, 1972.

H. Randall Bixler, McLean, Va., attorney of record, for plaintiff. Lewis, Mitchell, Bixler & Moore, McLean, Va., of counsel.

Judith A. Yannello, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray III, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner William E. Day with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166 (c). The commissioner has done so in an opinion and report filed on October 26, 1971, wherein such facts as are necessary to the opinion are set forth. Plaintiff filed a request for review of the commissioner's opinion by the court and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Accordingly, plaintiff's motion for summary judgment in opposition to the decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 11849, 11952, 11955, 12001, 12028, 12030 and 12031 is denied; defendant's motion in support of the decision of the Armed Services Board of Contract Appeals on the same appeals is granted; and, plaintiff's petition is dismissed.

## OPINION OF COMMISSIONER

DAY, Commissioner:

This is a contract case which is before the court on plaintiff's motion and defendant's cross-motion for summary judgment under Rule 163(b) (1) and (2). Review is sought in accordance with the standards prescribed by the Wunderlich Act, 41 U. S.C. §§ 321, 322, of a decision of the Armed Services Board of Contract Appeals.[1] The Board denied a total of seven claims by the plaintiff arising from a contract between the plaintiff and the defendant. The responsible contracting agency was the Department of the Army, Sacramento District, Corps of Engineers, located at Sacramento, California. Plaintiff is a Nevada corporation with its principal place of business in Long Beach, California. In this court, plaintiff challenges the decision and findings of the Board as not supported by substantial evidence, as arbitrary and as erroneous as a matter of law.

Contract No. DA–04–167–ENG–3403, dated May 28, 1964, was a fixed price construction contract[2] for a total price of $599,300, awarded to plaintiff following competitive bidding. The plaintiff agreed to perform several separate items of construction work at Travis Air Force Base, California, all work to be completed by April 1, 1965. Final completion of the contract was successful, and is not in issue here. All of the contractor's claims arise under Item No. 1 of the contract, entitled "Hydrant Fuel System."

Item 1 essentially required plaintiff to convert an existing aircraft fuel pumphouse into a hydrant fuel pumphouse, including fixtures. Of primary importance for the issues presented in this case was a requirement that the contractor extend fuel feeder lines, totaling 6 in number, under the existing concrete apron of the airfield; and construct at several points along these lines hydrant stations that would permit aircraft to be fueled in place on their parking hardstands. In order to lay the fuel pipelines the contractor had to tear up (or

1. Tri-Cor, Inc., ASBCA Nos. 11849, 11952, 11955, 12001, 12028, 12030 and 12031, June 6, 1968, 68–1 BCA ¶ 7064.

2. The contract was executed on GSA Standard Form 23 (Jan. 1961 ed.) and contained SF 23A (April 1961 ed.) Additional General Provisions, Alterations, Technical Provisions, specifications, and drawings. It included standard disputes, changes, and suspension of work clauses.

"break out") and remove from the apron 6 narrow strips of concrete, called "laterals." The laterals were numbered sequentially from 1 to 6. In order to minimize interference with the operation of the airfield during performance of Item No. 1, the item was subdivided into three phases of work. Each phase consisted of (in addition to work not in issue) the construction of one pair of laterals. Thus phase 1 consisted of the breakout and excavation of laterals 5 and 6, construction of the hydrant valve boxes along these laterals, installation of fuel and electrical lines, backfilling of the trenches, pouring in of new concrete, and curing time for the concrete. Phase 2 included work on laterals 3 and 4; and completion of laterals 1 and 2 was included in phase 3. All work on each pair of laterals, including curing time, had to be completed before the contractor would be permitted to begin breakout on the laterals in the subsequent phase. The final completion date of Item No. 1 was to be October 1, 1964. Subsequent contract modifications extended this date to October 17, 1964, and increased the total contract price to $627,310. The contract provided for liquidated damages in the amount of $150 per day for failure of the contractor to meet any intermediate completion date, including the Item No. 1 completion date. Since the contractor failed to complete Item No. 1 until November 20, 1964, the government deducted liquidated damages in the amount of $5,100 from the contract price.

Three of the contractor's claims involved the concrete breakout work under Item No. 1. ASBCA Nos. 11849 and 11955 are claims for equitable adjustments and time extensions under the changes and suspension of work clauses. The contractor claims he was prevented from pursuing a method of breakout that was permissible under the specifications, and then permitted to use this method only under burdensome and costly restrictions. ASBCA 11952 involves the contractor's claim that he was required to repair portions of the concrete taxiway not directly involved in the contract by a

method more costly than the one contemplated by the specifications, even assuming (as he does not) that this work was his responsibility. In ASBCA 12031 the contractor claims an adjustment based on what he conceives to have been unjustified acceleration orders by the contracting officer. ASBCA 12001 is a claim for suspension of work clause adjustments based upon the late receipt of revised drawings needed to comply with certain change orders. ASBCA 12028 is a claim for remission of liquidated damages and ASBCA 12030 is a claim for impact damages, or a total cost recovery, based on the above-mentioned substantive claims. The contractor seeks $116,250 and an extension of 7 days under 11849; $5,948 and 14 days under 11955; $14,750 and 6 days under 11952; $8,853 and 8 days under 12001; $5,100 under 12028; $76,303 under 12031, and in the alternative, a total cost recovery of $222,615 for the claims numbered 11849, 11952, 11955, 12001 and 12031.

## I. Standard of Review

■ ■ At the threshold of this case, plaintiff makes the contention that this court should apply a more stringent standard of review to the findings of fact of the Board than is usual in Wunderlich Act reviews. The hearing before the ASBCA was presided over by a hearing officer who did not subsequently participate in the consideration or decision of the appeals. The plaintiff does not argue that the rendering of the decision by three members of the Board other than the hearing officer renders the decision a nullity. It is well-settled that "[t]here is no applicable rule stating that the board decision must be rendered by the individual who presided at the hearing," and consequently the hearing officer's participation in the decision is not required. Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 474 n. 11, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963). Instead plaintiff argues that the panel rendering the decision did not have the opportunity to observe the demeanor of the witnesses.

Since the decision of the Board necessarily required it to discredit some or all of the testimony favorable to the plaintiff, plaintiff maintains that the findings of the Board are not merely unsupported by substantial evidence, they are also arbitrary. Therefore, plaintiff asks the court to carefully weigh the opposing evidence and in effect to require more than substantial evidence to support the findings of the Board.

This argument is without merit. In dealing with substantially similar contentions, this court has recently stated:

> * * * It is the plaintiff's position that the findings of fact made by the ASBCA are a nullity *and without binding effect* on this court since the presiding member of the Board neither wrote the Board's decision, nor was he a party to it. This contention must be rejected for we recently stated that in the absence of a rule compelling the Board's decision to be rendered by the presiding member there is no such requirement. * * * [Emphasis added.]

[Sundstrand Turbo v. United States, 389 F.2d 406, 410, 182 Ct.Cl. 31, 38 (1968).]

Plaintiff presents no argument that the Board did not consider all the evidence presented to it. *See* Sternberger v. United States, 401 F.2d 1012, 1017, 185 Ct.Cl. 528, 537 (1968). The Board's decision and findings indicate a careful review of all the evidence. Nor does plaintiff argue that the record is incomplete or otherwise defective. Furthermore, in a case like the present one in which the evidence presented to the Board is of a technical nature, the utility of physical observation of the witnesses is marginal at best.

The standards of review in this court of the findings of fact in an administrative determination are not mere rules of convenience. Under Wunder-

lich Act criteria, administrative determinations in contract disputes of fact are conclusive and binding on this court unless the findings of fact are arbitrary, capricious or not supported by substantial evidence on the record as a whole. The standard of substantial evidence goes to the reasonableness of what the agency did on the basis of the evidence before it. United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).[3]

Since the ASBCA panel deciding this case was properly constituted, and the proceedings have not been shown to be defective, there is no basis for departing from the substantial evidence criteria in evaluating the findings of fact of the Board.

## II. The Claims for Concrete Breakout and Repair of the Adjacent Concrete

The laterals from which concrete was to be removed under Item No. 1 represented relatively narrow strips of a broad expanse of concrete apron. The proposed laterals were entirely confined by concrete except at one end of each lateral where the concrete ended and was bounded by soil or other nonrigid material. Each lateral trench was to be 5 feet wide and approximately 600 feet long. The concrete was nonreinforced, but it was of a strong composition. The average depth of concrete was 18 inches, although one lateral was located on an older section of the apron where the concrete was at most about 10 inches thick. After the concrete had been removed, the trenches were to be excavated somewhat below the level of the adjacent concrete. After the pipes were emplaced, backfill would be added and new concrete poured to a depth of about 23 inches. Once the new concrete was cured, heavy aircraft would roll over the apron as before. Structural soundness of the entire apron once the work was completed was emphasized in the contract.

3. An excellent discussion of the substantial evidence criteria is presented in Kop-

pers Co. v. United States, 405 F.2d 554, 556–559, 186 Ct.Cl. 142, 147–151 (1968).

The relevant technical provisions related to the concrete work are as follows:

2-03 REMOVAL OF EXISTING PAVING: The Contractor shall remove existing concrete apron or taxiway pavement and flexible shoulder and roadway pavement to the limits shown on the drawings, or to the extent required to install the refueling system, subject to the approval of the Contracting Officer. Phasing of the work shall be as shown on the drawings and/or *SPECIAL CONDITIONS*. Existing tie-down anchors removed in apron paving shall be relocated in new pavement. [Emphasis added.]

a. *Removal of Concrete Pavement:* Where the line of removal does not coincide with an existing joint in the pavement, the Contractor shall cut along the line of removal with an approved concrete saw to a min. depth of saw cut of 6 in. Concrete shall be removed *by jackhammers or percussion drills and hydraulic or mechanical expanders without cracking or damaging the adjacent concrete or subgrade.* Vertical surfaces shall be thoroughly cleaned and all chips, spalls, and sealing compound shall be removed prior to placement of new concrete. Broken concrete shall be disposed of in waste areas shown. *Damages to the adjacent concrete resulting from Contractor's operations shall be satisfactorily repaired at his own expense.* [Emphasis added.]

\* \* \* \* \* \*

6-29 REPLACEMENT AND REPAIR OF CRACKED AND SPALLED NONREINFORCED CONCRETE SLABS: Replacements or repairs shall be limited to work on slabs adjoining crack[ed] or damaged due to work on this project or containing concrete removed for new piping or electrical work. Random cracks, nonworking contraction joints adjacent to cracks, spalls, and broken slabs shall be repaired as specified hereinafter.

\* \* \* \* \* \*

g. *Work required under paragraph Replacement and Repair of Cracked and Spalled Nonreinforced Concrete Slabs:* Payment will not be made for furnishing any labor, materials, tools, and equipment, and for performing work required by the referenced paragraph when it is determined by the Contracting Officer that the need for the work *resulted from negligence or nonconformance with the contract plans and specifications by the Contractor.* [Emphasis added.]

The contractor received a notice to proceed on the contract dated June 16, 1964. He had scheduled commencement on Item No. 1 for June 29 (all dates 1964 unless otherwise specified), but the actual work did not begin for reasons not clear in the record until July 2. The initial work was the concrete sawing operation. Breakout work began on July 14 and 15. On those 2 days the contractor's employees at laterals 5 and 6 were using two portable jackhammers of the type commonly observed in use at roadway repair sites. In reaching its decision on these appeals, the Board defined the term "jackhammer" as follows:

A jackhammer is a portable tool hand held by the operator weighing in the neighborhood of 80 to 100 pounds that operates by the application of compressed air to the rear of the bit or head while the latter is held against the pavement. The bit tends to recoil or bounce from the pavement but is not lifted for the purpose of propelling it downward with a striking effect.[4]

On July 16, however, the resident inspector at Travis Air Force Base for the government (Mr. Meissen) observed the plaintiff's employees utilizing a heavy wheel-mounted pavement breaker known in the industry as a "stomper." A stomper, as defined by the Board is:

\* \* \* a much larger device whose operating parts weigh close to 1000 pounds, including an air cylinder about 6 feet high, and is mounted, either on its own 4 wheel self-propelled chassis

---

4. 68-1 BCA at 32,649-50.

with a seat for the operator or over the tail gate of a heavy truck. The business or striking end of the stomper as most often used by appellant consisted of a chisel edged bit about 12 inches long and 4 to 5 inches broad. The bit is at the lower end of a rod the upper end of which is connected in turn to a piston seated in the air cylinder. The bit is thrust downward on to the pavement by the repeated action of the piston and returns after each stroke to a position 2 or 3 feet above the pavement. The stomper delivers many times more force at the pavement than a conventional jackhammer.[5]

Mr. Meissen immediately ordered the contractor's site superintendent (Goetz) to stop using the stomper and to remove it from the site. The grounds for this order were that the stomper was not a tool permissible for concrete breakout under the specifications; and that the terrific impact on the pavement caused by the stomper blow threatened to cause extensive damage to the surrounding concrete apron. The contractor's employees protested that both of these conclusions were erroneous. Nevertheless, later that day (July 16) the successor contracting officer (Col. Mathe) confirmed the oral stop order by telegram, as follows:

> * * * You are directed to comply strictly with provisions of paragraph 2–03a of contract specifications on removal of concrete pavement. Any tool may be used for breaking or drilling where the bit or gad in contact with the pavement is hit by a hammer. Any tool where the bit, gad or foot is elevated above the pavement and then dropped or propelled downward against the concrete violates the intent of specification and cannot be used. You are directed to proceed accordingly placing sufficient men and equipment on work so that contract time requirements are met. Confirming letter follows.

Col. Mathe confirmed the stop order by a letter dated July 23, using substantially identical language.

The contractor continued to protest the stop order, contending that a stomper was a kind of jackhammer, thus in compliance with specification 2–03a. The contractor further insisted that he could not practically perform the contract using portable jackhammers and that stomper machines presented no increased risk of damage to the adjacent pavement.

Although convinced that stompers were in violation of the specifications, and capable of causing structural damage to the adjacent concrete, the government personnel involved were not unwilling to listen to the contractor's contentions. Therefore, on July 20, a conference was held between Tri-Cor and Corps of Enginers personnel to discuss the impasse. At this meeting it was agreed that the contractor would be permitted to perform experiments with the stompers at the site to determine if a method satisfactory to the government could be devised that would allow Tri-Cor to use the stompers yet minimize the risk of damage to the adjacent concrete and subgrade. Several days thereafter, the government personnel at least were satisfied that a method of breakout utilizing the stomper had been developed. The details of the procedures approved by the Corps personnel were contained in a letter from Col. Mathe to Tri-Cor dated July 23, which follows:

> Reference is made to my letter of 21 July 1964, confirming my telegram of 16 July 1964, concerning pavement removal under Contract No. DA–04–167–ENG–3403. Further reference is made to our conference of 20 July 1964 concerning the concrete pavement removal at which I agreed that you could experiment with the removal in an effort to develop a method utilizing the equipment on the job that would break out the concrete without damage to adjacent concrete or to the subgrade.

5. 68–1 BCA at 32,650.

I am advised by our Messers. Hart and Yokomizo that by experimenting on 21 July 1964 you developed the following method for pavement removal:

a. Drill four lines of 3 inch holes through the slab, one row adjacent to each edge of the removal area and the other two rows approximately on the third points of the removal width.

b. Using the hydra-hammer or "stomper" set to strike at a slow measured pace, rather than with quickly repetitive blows, break out the concrete between the drill holes on one of the third point rows to the depth the striking tool will reach, which is $\frac{3}{4}$ or $\frac{4}{5}$ of the depth of the slab.

c. Using the "stomper" and the same blow speed, break out the concrete between the drill holes on the other third point row, at the same time breaking and moving the concrete toward the first row broken.

d. Using a backhoe or Gradall with backhoe attachment, remove the concrete broken under b. and c. above.

e. Using a Gradall with rooter tooth attachment, root between the two third point hole rows until it is assured that the slab is broken through its entire depth between these rows.

f. Using the "stomper" and the same measured blow speed, break down the sides to the removal lines, tipping them into the space vacated under d. and e. above.

g. Remove the broken concrete with a backhoe or Gradall and trim the sides of the cut with one man air driven pavement breakers as necessary.

Although the method outlined above violates the terms of my letter of 21 July 1964, its use will be satisfactory; provided, the drill hole pattern conforms to the inclosed sketch with the 6 inch spacing between holes being used on all rows adjacent to saw cuts and on the row used for initial breaking; provided, the "stomper" is operated to deliver blows at a slow measured pace and not with the quickly repetitive blows of which it is capable;

and *provided further it is* not [*] *understood that all costs resulting from the use of the outlined removal method shall be for your account, and that any damage to adjacent concrete resulting from your operations must be satisfactorily repaired by you at your expense.* [Emphasis added.]

* The word "not" appears to be a typographical error.

At the hearing, Tri-Cor witnesses (especially the company president, Mr. Slatton) denied that plaintiff had participated in the writing of, or had agreed to the method outlined in the July 23 letter. Plaintiff argued that the restrictions on the use of the stomper served no purpose but merely added time and expense to the breakout operation without compensating advantages. Plaintiff also objected to being made strictly liable for damage to the adjacent concrete.

Nevertheless, plaintiff resumed breakout operations on July 25 and followed the method outlined during the performance of the whole of Item No. 1, except for a minor modification not in issue. Plaintiff successfully completed the breakout work on the 6 laterals but instead of the 20 days plaintiff had scheduled for this portion of the work, plaintiff contends the breakout took 97 days. Plaintiff also contends that its costs were greatly increased, partly due to the slower pace and also due to the necessity for drilling the large number of holes discussed in the July 23 letter.

On August 11 the contractor notified the government that a dispute existed on the issue of whether the use of a stomper without restrictions was permissible under the terms of the specifications.

The contractor has based two claims on this issue. First, he argues that since the stomper was a permissible tool under the specifications, the time during which work on Item No. 1 was held up between July 16 and July 25 constituted an unreasonable delay for the convenience of the government; hence the contractor is entitled to costs incurred during this

period and a time extension under General Provision 30 (the suspension of work article). This is the substance of ASBCA 11955. The contractor also argues (along similar lines) that the stomper procedures imposed on Tri-Cor in the contracting officer's letter of July 23 constituted a change of the specifications entitling the contractor to an equitable adjustment under General Provision 3 (the changes article). This is the essence of ASBCA 11849.

During the course of performance of the concrete breakout work under the modified procedures, government inspectors at Travis Air Force Base noted what they considered to be extensive damage to the adjacent concrete and subgrade. This damage they attributed to the heavy blows of the stomper. The contracting officer in conformance with a proviso in the last paragraph of his July 23 letter, ordered the contractor to submit a plan for repair of the damage at Tri-Cor's expense. This order was contained in a letter dated August 6, 1964, which stated in part:

\* \* \* \* \* \*

An inspection of the concrete removal on lateral No. 5 on 30 July 1964 and again on 5 August 1964, revealed that considerable damage to the existing concrete has taken place, and includes excessive underbreakage and cracking of existing concrete.

In view of the above, you are directed to submit, for approval, details covering your proposed method to correct this situation at no additional cost to the Government, as required by paragraph 2–03a of the contract specifications. \* \* \*

Tri-Cor responded to this letter on August 7. The substance of the reply was that when the replacement concrete was poured into the laterals it would flow into any cracked or underbroken areas, and thus achieve the desired repairs without any additional effort on the part of the contractor.

In a letter dated August 14, the contracting officer rejected this proposal.

Col. Mathe indicated that while the proposed method might adequately repair areas of light-to-moderate damages, there were areas of severe cracking and underbreaking which would remain weakened after the new concrete was added. At the hearing, government witnesses explained that where the damage was severe there was no assurance that the new concrete would completely flow into the areas of severest damage.

A second Tri-Cor proposal was also rejected as inadequate. Finally (on August 27) the contracting officer accepted a significantly more complex, costly and time-consuming method of repair that promised to satisfactorily repair even the worst damage. This involved application of a two-part epoxy bonding agent, followed by a method of forcing a liquid concrete mixture through a tube, under pressure, into the areas of severe damage, ultimately restoring the vertical sides of the trenches to within 6 inches of the cut lines. The process involved is referred to in the record as "guniting."

The contractor performed all the required repair work according to the latter method, but also initiated a claim that was before the Board as ASBCA 11952. The contractor contends that he should not have been held strictly liable for the damage to the concrete, by the contracting officer's letter of July 23, because the stomper was permissible under the specifications. Plaintiff argues that some damage was contemplated in the original contract, which provides (in paragraph 6–29 of the specifications) for repair of damage to adjacent concrete at government expense if the damage is not the fault of the contractor. Plaintiff insists that the damage done was only minor in nature and was a normal incident of any concrete removal operation. However, even if Tri-Cor were liable for performing the repairs, plaintiff argues, the original method proposed on August 7 (involving the replacement concrete) was adequate under the specifications and drawings. For example, plaintiff notes, drawing sheet 37 in the record shows the bottom edges of the adjacent

concrete resting on the new concrete, illustrative of the fact that some undercutting was envisioned when the contract was written. Therefore plaintiff concludes the guniting operation was extra work, outside the specifications, for which Tri-Cor is entitled to an adjustment under the changes clause.

*A. The Method of Concrete Breakout*

In resolving plaintiff's contentions that the use of stompers was in compliance with the specifications, the principal issue confronted by the Board was the proper interpretation of specification 2–03a.

■ It is a well-established principle that the interpretation of a contract is an issue of law. Therefore, the decision of an administrative board interpreting a contract specification is not entitled to finality and is not binding on this court. Martin Lane Co. v. United States, 432 F.2d 1013, 1015, 193 Ct.Cl. 203, 207–208 (1970). However, even if the ultimate interpretation is a question of law, "the underlying factual determinations [of the Board] are entitled to finality if substantially supported." D & L Constr. Co. v. United States, 402 F.2d 990, 993, 185 Ct.Cl. 736, 743 (1968).

In the instant case the Board held that:

> On the evidence we have no doubt that the use of stompers was not authorized by section 2–03a of the specification.[6]

The Board reached this interpretation based upon its findings of fact. The parties, in their moving briefs in this court, essentially treat the interpretation issue as depending on the soundness of the Board's findings of fact. This appears to be the correct approach. Taking the findings as a whole, if they are supported by substantial evidence, then the interpretation found by the Board is virtually dictated as the only reasonable one. This is true, at least with regard to the contentions made by the plaintiff. This is because reading the specifications as a whole, in light of the clearly expressed purposes of the contract, paragraph 2–03a cannot reasonably be read to permit the use of heavy pavement breakers of the stomper type.

A fair reading of the evidence presented in this case before the Board leads to the conclusion that the findings of fact made by the Board are supported by substantial evidence.

The basic contention of the plaintiff is that the use of stomper machines is in full compliance with the terms of the specifications. This is true, argues the contractor, because a stomper is nothing more than a large, wheel-mounted jackhammer, as that term is used in paragraph 2–03a. Plaintiff notes that neither party was able to present to the Board any standard definition of the term "jackhammer" that either expressly or impliedly includes or excludes stomper-type tools. Therefore, industry experience must be relied upon, and plaintiff argues that in the industry, stompers are normally utilized in concrete breaking operations of the type involved in this contract. Plaintiff also refers to the contracting officer's stop orders of July 16 and July 21, in which a distinction is drawn between tools on which the bit rests against the pavement and is struck from above, and tools on which the bit is elevated above the pavement and propelled or dropped downward. The contracting officer regarded tools in the former category (portable jackhammers and percussion drills) as permissible, but tools in the latter category (stompers) as in violation of the specifications. Plaintiff argues that this distinction is invalid because even the bit on a portable jackhammer bounces above the pavement during operation. Most of the testimony on behalf of the plaintiff on these points was presented by two witnesses. Mr. Slatton (Tri-Cor's president) testified on the basis of long experience in the construction industry, and on the basis of periodic visits to the site at Travis, supplemented by daily reports from his

6. 68–1 BCA at 32,650.

personnel permanently located there. An expert witness (Mr. Warner), who was presented as a construction consultant, testified generally on the problems presented by this contract. The qualifications of the expert were vigorously disputed by counsel for the government, but the hearing officer (while noting the objection) permitted Mr. Warner to testify. Mr. Goetz (the Tri-Cor superintendent at Travis) also testified on the use of the stompers, but more briefly.

The Board found that a stomper is not the same type of tool as the one commonly referred to as a jackhammer.[7] The Board considered evidence presented by the government that the difference between these machines is more than the fact that one is larger than the other. The stomper actually functions differently. The stomper bit is raised several feet in the air and is propelled downward with great force into the pavement. The jackhammer bit is placed against the pavement and is propelled directly against it. While the jackhammer bit may recoil somewhat above the pavement, it is not deliberately elevated. Consequently, the jackhammer blow is more localized and significantly less potent than that delivered by the heavy pavement breaker. Several employees of the Sacramento District, Corps of Engineers, testified as to these distinctions. These witnesses had never heard a stomper referred to as a jackhammer, nor had they seen any documentation so referring to a stomper. Taken as a whole, the testimony in the record (supplemented by photographs of the stomper and exhibits describing portable jackhammers) strongly supports the Board finding that a jackhammer is functionally a distinct type of tool from the heavy pavement breakers known as stompers. Conversely, the plaintiff's evidence does not detract from the finding, but merely serves to establish that the two types of tools perform the same purpose—breaking concrete.

A second key contention by the plaintiff is that the term "jackhammer" must be read as including stompers because it would be practically impossible to perform the concrete breakout work on the Travis apron using portable jackhammers. Illustrative of this fact (in plaintiff's view) is the work done by Tri-Cor employees using portable jackhammers on July 14 and July 15. The total progress, using two jackhammers over the 2-day period was a mere 7 feet of 5-foot-wide lateral. At this pace, to complete the breakout work on all 6 laterals within the 20-day time period plaintiff had scheduled for this work, plaintiff estimated that it would have needed to employ between 100 and 200 men with half as many jackhammers. Therefore, plaintiff insists heavy pavement breakers were not only permissible, they were required to complete the breakout within reasonable cost and time limitations.

However, as the Board found, the contention that portable jackhammers alone were not adequate to perform the contract (even if true) does not meet the language of the specifications. Its discussion on this point reads thus:

> The contention is without merit. In the first place, section 2–03a did not refer exclusively to jackhammers but to jackhammers OR percussion drills. In the second place, section 2–03a did not provide that either, or both, of those two tools when selected would be the exclusive means of breaking the pavement. Section 2–03a required that the use of either jackhammers or percussion drills be accompanied by the use of pavement expanders. Appellant's argument, therefore, ignores that portion of section 2–03a which, on the evidence, is the most significant portion of all, namely, the use of directional pavement expanders which, on the evidence, would overcome the tension that was the chief obstacle to the breakout, and do this in the most practical and least damaging manner. The

---

7. The definitions formulated by the Board for the terms "jackhammer" and "stomper" are set out in full, *supra*.

stompers were in fact not only different in principle and in their effect on the pavement from hand held jackhammers but their use defeated ends which, on the evidence, would have been served by the use of pavement expanders.[8]

Mr. Meissen (the resident inspector), Messrs. Hart and Mead (of the Corps of Engineers), Mr. Cable (the government estimator on the contract) and Mr. Gutherie (a geologist of the Corps of Engineers) all testified as to the practicality of laterally moving the concrete through the use of jackhammers, percussion drills and mechanical or hydraulic expanders— all tools listed in paragraph 2–03a. As found by the Board, a percussion drill is similar to a jackhammer, but has an additional rotary motion of the bit. Pavement expanders (also called "rockjacks") are cylinders which are placed in drill holes in the pavement, the cylinders are equipped with plungers or jacks which are manipulated to exert a terrific pressure on the concrete slabs in the direction of an open space in the pavement, causing the concrete to fail in tension. The Board found (and ample testimony of a detailed and persuasive nature tended to prove) that the use of these tools in conjunction with each other provided a means, not only to break out the concrete in an efficient and economical manner, but to do so in a way that did not present any significant risk of damage to the adjacent concrete or subgrade. The Board stated:

* * * The evidence would not justify a conclusion that there is any actual or practical impossibility inherent in an application of the described method to the concrete pavement here involved.[9]

This court has recently stated in Koppers Co. v. United States, 405 F.2d 554, 558, 186 Ct.Cl. 142, 149–50 (1968) that:

Whether specifications are factually impossible or commercially impracticable to perform is a question of fact, not of law * * * and should be decided by the Board. [Citation omitted.]

Although plaintiff contends that the finding of the Board (to the effect that the use of directional pavement expanders would have been practically possible) is not supported by substantial evidence, there is ample testimony from which the Board was able to draw this conclusion. While the statement by the Board that "[t]here is no evidence that appellant ever took into account the possibility of relieving the tension in the concrete in the strips by moving it laterally with pavement expanders" [10] may be too strong, the evidence clearly indicates that the plaintiff was committed to the use of stompers and did not attempt to devise alternate means of removal.

■ In summary, there is substantial evidence in the record to support the findings of the Board that paragraph 2–03a did not explicitly permit the use of stompers and that the specifications did not impliedly permit the use of stompers, because it was practically possible to perform contract work under the specifications without heavy pavement breakers. In addition, it becomes unreasonable to read the specifications as permitting the use of heavy pavement breakers when consideration is given to that portion of paragraph 2–03a which directs that "[c]oncrete shall be removed * * * *without cracking or damaging the adjacent concrete or subgrade."* [Emphasis added.] The primary consideration of the government in preventing the use of stompers was the risk that the heavy stomper blows would cause damage in the adjacent portions of the concrete apron. Plaintiff insists that the stomper did not present any significant risk of damage to the subgrade or adjacent concrete. Plaintiff does not deny that there was some cracking and underbreaking in the adjacent concrete, but plaintiff characterizes this damage as minor, as a normal incident of any method of breakout, and as damage of a nature that was con-

8. 68–1 BCA at 32,651.

9. 68–1 BCA at 32,650.

10. 68–1 BCA at 32,650.

templated in the terms of the contract specifications and drawings. Plaintiff especially contends that there is no evidence that the stomper caused this damage.

However, there is rather overwhelming evidence in the record (in the form of testimony by Corps of Engineers personnel, of inspection reports by government inspectors and of photographs and sketches) that there was severe damage to the adjacent concrete and subgrade. There is also substantial evidence that the types of damage that occurred were peculiarly of the types it had been feared the stomper would cause. There is also substantial evidence that the lateral movement of the concrete by the use of expanders would not have caused any substantial damage to the adjacent concrete. The contentions of the plaintiff, then, cannot be accepted. The findings of the Board on the nature of the damage are as follows:

> During execution of work by the modified stomping method there was breakage below the surface of adjacent pavement beyond the indicated cut lines, described by the parties as "underbreakage."

> A preponderance of evidence establishes that the use of the stompers within the area of the hydrant lateral strips heavily damaged existing adjacent pavement beneath the surface. The heavy blows of the stompers did not produce vertical shearing or horizontal fracture but rather sloping lines of fracture varying between 20° to 60° from the vertical, roughly approximating the sloping sides of a cone whose apex would be the point of impact on the surface. Where the point of impact was near the specified cut line of the lateral strips, those sloping lines extended under the surface of the adjacent pavement, producing the underbreakage in question. The voids created under the adjacent surface of pavement were not always open to view from the area of the excavated lateral strip but were partly obscured by overhanging projections of concrete which had not been broken loose.

> Moreover, it was found that the subgrade had become separated from the adjacent pavement along the borders of the lateral strips, a condition which has not been accounted for by any events other than additional compaction of the subgrade caused by the heavy blows of the stompers.[11]

Given the fact that there was some damage to the adjacent concrete and subgrade, the Board finding that the damage was excessive was a pure finding of fact to be drawn from the conflicting evidence. There was more than substantial evidence in the record to support the finding actually made. Furthermore, evidence by government witnesses characterized some of this damage as sloping lines of fracture extending from the open laterals into the adjacent concrete. Other damage was described as compaction of the subgrade under the adjacent concrete. The only reasonable inference from the evidence is that this damage was the result of the stomper blows on the lateral pavement. Plaintiff denies that this conclusion is proper, but it offered no evidence that would suggest any other possible cause of these types of damage. The evidence also justified the Board conclusion that such damage would not have occurred had the breakout been achieved by the use of portable jackhammers, percussion drills and pavement expanders. The use of these tools obviously would have avoided subjecting the apron to the crushing impact that was the primary characteristic of the stomper operation.

It is true (as the contractor points out) that paragraph 6–29g of the specifications provided that the government would absorb the repair costs of incidental damage not the fault of the contractor. It is also true that drawing sheet 37 shows the edges of adjacent concrete resting on a new base of the replacement concrete in the laterals. Together these

11. 68–1 BCA at 32,649.

documents show that some degree of damage was allowable or even anticipated. These facts do not avail the contractor here, because the finding of the Board was that the damage was not only more severe but also different in kind than that indicated in the contract documents.

The contract directed that damage of this order should be avoided. The specifications listed tools that could be used to avoid this type of damage. The Board found that the specifications (read in this context) could not be interpreted to permit the use of heavy pavement breakers. This interpretation appears to be the correct one—indeed, on the evidence, it appears to be the only reasonable interpretation.

■ Plaintiff urges, as an alternative ground of relief, that the specification 2–03a was ambiguous, apparently attempting to take advantage of the rule that ambiguities in specifications drawn by the government are resolved in favor of the interpretation relied on by the contractor. However, this rule applies only if the contractor has made a reasonable interpretation of the specification. *E. g.*, Jamsar, Inc. v. United States, 442 F.2d 930, 194 Ct.Cl. 819 (1971). As indicated above, it would not be a reasonable interpretation to view the specifications as authorizing the use of stompers.

■ The better view is that the specification 2–03a is not ambiguous. A contract is not rendered ambiguous merely because the parties disagree as to its meaning when the disagreement is not based on reasonable uncertainty of the meaning of the language used. Bishop Engineering Co. v. United States, 180 Ct.Cl. 411, 416 (1967). The court also stated in that case that:

* * * The fact that an improvident interpretation placed by a contractor upon the specifications may even be considered conceivable, is not a sufficient basis alone for construction of the contract against the author of the language, if not reasonable when the contract is considered as a whole and

in light of the purpose of the contract. * * * [p. 416.]

Finally, if the contractor thought that the specifications were practically impossible to perform, he was not free merely to assume that he could substitute a stomper for the listed tools. General Provision 2 of the contract provides in part:

* * * In case of discrepancy * * * in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. *Any adjustment by the Contractor without such a determination shall be at his own risk and expense.* * * * [Emphasis added.]

*See* Jamsar, Inc. v. United States, *supra*.

While not determinative of the course the contractor should have pursued, the record reveals that during the prebid period two potential bidders actually did inquire whether stompers or heavy pavement breakers would be permitted for use during the breakout work. These inquiries were answered in the negative.

Plaintiff seeks to characterize these inquiries from other bidders as an indication that the industry considered the term "jackhammer" to include heavy pavement breakers. However, it seems equally likely (as the government notes) that these inquiries indicate that the other firms did not feel comfortable in interpreting "jackhammer" to include stomper. Even more significant, at the time these inquiries were made, the only tool mentioned in specification 2–03a was the jackhammer. Shortly after these inquiries the specification was amended to include percussion drills and mechanical or hydraulic expanders. There was some evidence that the purpose of this amendment was to clarify the specification by adding all the tools thought suitable for concrete breakout without risking unacceptable damage to the adjacent concrete and subgrade. In retrospect, it may seem that the wiser course would have been for the government to have notified all potential bidders specifically

that heavy pavement breakers would not be allowed. Yet the amendment that was made, at least should have made all the more clear to the bidders, the type of concrete breakout operation that was desired. It is one more indication that Tri-Cor's interpretation of paragraph 2–03a was not reasonable.

For all the foregoing reasons, it must be concluded that the Board's decision (that specification 2–03a did not permit the use of stompers) was supported by substantial evidence and was correct as a matter of law.

■ Since the contractor had no contractual right to the use of stompers, the contracting officer was entitled to prevent their use by his July 16 stop order. The Board decision that the delay subsequent to the stop order was not the fault of the government (in ASBCA 11955) must be taken as correct and the contractor is not entitled to a price increase or time extension.

■ Similarly, when the contracting officer permitted the contractor to use stompers, this action was entirely for the benefit of the contractor, and the contracting officer could condition the use of these machines in any way he considered necessary. Thus the contracting officer's letter of July 23 was not a compensable change of the specifications within the meaning of the changes articles of the contract. The contractor was not in any sense required to use stompers—he was given permission to use them if he so desired. The contractor could have used alternative means fully conforming with the specifications to perform the breakout work. When he chose to use the stompers, he could not complain that their use was restricted, or that he had to be fully responsible for any damage to the adjacent concrete or subgrade. Thus the decision of the Board in ASBCA 11849 must also be upheld.

### B. *The Repair of the Adjacent Concrete*

Paragraph 2–03a of the specifications directed that the concrete be removed from the laterals without causing damage to the adjacent concrete or subgrade. Paragraph 6–29g of the specifications provided that the contractor alone must bear the expense of repairing the adjacent concrete if the need for the work was caused by the negligence of the contractor or by his nonconformance with the specifications and drawings. The contracting officer's letter of July 23 permitting the contractor to use stomper machines warned that any damage to adjacent concrete must be satisfactorily repaired by the contractor at his own expense, as a condition of using the equipment in violation of the specifications.

■ It has already been determined that the Board correctly found that stomper machines were not permitted by the specifications. The Board made a finding of fact (supported by substantial evidence) that the use of the stompers caused severe and excessive damage to the adjacent concrete and subgrade. Thus, even disregarding the terms of the July 23 letter, the Board was entitled to conclude that the contractor was bound to repair the adjacent areas at his own expense.

Conversely, under the terms of the July 23 letter, it is irrelevant whether the damage was excessive or not. The contractor was not required to follow the procedures outlined in the letter. He could have abandoned the use of stompers and complied with the terms of specification 2–03a. Having chosen to continue with the use of the stomper, as restricted, the contractor did so cognizant of the proviso that he would be liable for any resulting damage.

The only question remaining under the issue of concrete repair as presented in ASBCA 11952 is whether the contractor was required to perform the repair work by an excessively complex, costly and time-consuming method. The Board found that:

* * * guniting was an appropriate and necessary means for filling the deep voids created beneath the surface of the adjacent pavement by the stomp-

ing operation, and would promote adequate transfer of loads incident to the passage of aircraft between new lateral strip pavement and adjacent old pavement.[12]

Determining the method of concrete repair suitable to restore damaged concrete to a condition at which it is again safe to permit the passage of heavy military aircraft over the apron is a pure finding of fact to be made from an assessment of the conflicting evidence.

The plaintiff (as previously indicated) initially proposed that the broken and undercut areas of the adjacent concrete would be filled in by the addition of replacement concrete in the laterals. Plaintiff subsequently proposed that a grouting mixture be applied with a trowel. Both these proposals were rejected by the government on the basis that they were inadequate to strengthen the damaged concrete. These methods did not permit concrete to flow completely back into the broken and cracked areas. Consequently, voids would remain in the concrete apron under the surface, creating a risk that the apron would collapse under the weight of heavy aircraft.

 It has already been determined that the Board finding that the damage was of a serious nature was supported by substantial evidence. There was also considerable evidence in the record that many of the cracked areas were too small to permit the normal flow of concrete into them. Others extended too far back into the apron. On the basis of this evidence, the Board was justified in finding that the gunite method of repair was reasonably necessary to fully restore the areas of damage. While the methods initially proposed by plaintiff would have been adequate if the damage had been minor, there was no evidence indicating that the proposals were responsive to the degree of damage that was found to exist.

Consequently, the plaintiff merely lived up to his contractual obligation to repair in performing the guniting oper-

ation. There was no extra work involved compensable under the changes article. The conclusion of the Board that the plaintiff is not entitled to recover in ASBCA 11952 must be upheld as supported by substantial evidence.

### III. Late Receipt of Hydrant Relocation Drawings

The purpose of the hydrant outlets branching off from each of the 6 laterals to be constructed under Item No. 1 of the contract, was to provide convenient locations for delivery of the fuel supplied by the pressurized fuel lines running from the hydrant pumphouse through the laterals. Part of the excavation job on each lateral was the construction of so-called lateral boxes—concrete pits similar to a manhole, in which the branch piping from the laterals would terminate, to be connected to the valving and controls known as the hydrant outlets.

There were to be a total of 6 hydrant boxes constructed from laterals 5 and 6— 3 from each lateral. By July 31, 1964, plaintiff was preparing to commence the work on these hydrant boxes when the following telegram, dated July 31, was received from Col. Mathe, the contracting officer:

\*　　\*　　\*　　\*　　\*　　\*

You are directed to proceed immediately with relocating fueling hydrants Nos. 220 to 225 inclusive on laterals 5 and 6. Hydrants to be relocated approx. 28 ft. SE of present location. New locations painted on pavement. Confirming letter follows.

No reason for the relocation order was given, nor is it revealed in the record. It is not alleged by plaintiff, however, that the change was motivated by faulty specifications.

The contractor attempted to proceed with the work but apparently the plaintiff's employees were unable to interpret the markings on the pavement. Consequently, on August 3, Col. Mathe advised the plaintiff that he could proceed "in accordance with revised drawings, which

12. 68–1 BCA at 32,651.

will be issued in the near future." On August 6, the contracting officer notified Tri-Cor that every hydrant box on all 6 laterals would be relocated. Therefore, on August 12 the contractor was requested to prepare a proposal for "furnishing all labor, material and equipment and performing all work to relocate fueling hydrants for Laterals 1 through 6."

The contractor ultimately received the drawings setting forth the revisions to the hydrant locations on laterals 5 and 6 on or about August 14, 1964. The drawings applicable to laterals 1 through 4 were received on or about August 20. The contractor completed the work successfully according to these drawings.

A change order (designated Modification No. 3) was issued on October 19, 1964, embodying the agreement of the parties as to the cost of the extra work occasioned by the hydrant relocation for all 6 laterals. The contract price was increased by $18,221 and the completion date of Item No. 1 was extended from October 1 to October 12. As the Board correctly notes,[13] the contractor has accepted Modification No. 3 as an appropriate adjustment for the extra work incident to the change order.

However, in a letter to Col. Mathe dated October 22, 1964, the contractor indicated the following reservations to the scope of the modification:

\* \* \* \* \* \*

2) On Page 2 of the Modification we do not agree with the time extension and must insist on a time extension as requested in our proposal.

3) Our rights are reserved in connection with all costs brought about by unreasonable delays encountered or which may be encountered with the subject changes in the work.

4) Our rights are reserved in connection with any acceleration claims now or hereafter filed.

The essence of the plaintiff's objections referenced in the above letter is that the modification made no provision for compensating the contractor for the period of delay he suffered between July 31 and August 14. The plaintiff contends that all work was at a virtual standstill during this period; the interruption occurred at a critical time, and because of the peculiarities of the order of work for contract performance created by the terms of the contract, Tri-Cor was unable to shift its efforts to other portions of the contract. While the contractor did not hold his employees idle, the work done during this period was merely fill-in and did not expedite later scheduled items in any meaningful way. Consequently, the contractor views this delay incident to the change order as unreasonable in its entirety. Therefore, the contractor seeks compensation for his overhead costs during this period, as well as a time extension to the contract, of 8 days.

The holding of the Board on this point was that the contractor had not sustained his burden of showing that the unchanged portions of Item No. 1 were delayed to *an unreasonable extent* by the late receipt of the drawing revisions, after taking into account the countervailing effect of any forward progress not contingent on the delayed work or accomplished by reason of revisions in the order of performance of work. The Board stated:

\* \* \* On the evidence we cannot find that appellant suffered any delay to the unchanged portion of any phase of Item 1 by reason of the late receipt of drawing revisions for hydrant relocations, and consequently cannot find that there was any unreasonable, compensable delay in connection therewith for the purposes of the suspension of work clause. The appeal in ASBCA No. 12001, therefore, will be denied.[14]

This conclusion was based on a number of findings of fact. First the Board found that the plaintiff had not shown why any work stoppage was necessary. The Board noted that the concrete on laterals 5 and 6 had to be removed wherever the hydrant boxes might be located. The

13. 68–1 BCA at 32,653–4.

14. 68–1 BCA at 32,655.

Board considered the testimony of Mr. Meissen (the government's resident inspector) and daily inspection reports made during the period in question. This evidence indicated that during the period when the contractor alleges no meaningful work was done—

> * * * appellant was breaking out concrete on 3 days, removing concrete rubble on 2 days, backfilling on 5 days, grading on 2 days, laying pipe on 2 days, working on pipe covers on 2 days, welding on 3 days, and working on the #5 control pit on 3 days, all under phase 1 of Item 1. To the extent of the pipe work appellant anticipated the order of work contemplated in appellant's own schedule, since the schedule contemplated that all concrete be broken out for a particular phase before the setting of any pipe, although this subphasing was not required by the contract * * *.[15]

The Board noted that the documentation showed that the contractor utilized a greater work force and a greater number of direct labor hours on the average, during the period of the supposed delay, than previously. The amount of equipment declined, the Board found, because the concrete breakout work on laterals 5 and 6 was nearly completed. Thus the Board concluded:

> * * * it is obvious that appellant did not stand by on the unchanged portion of phase 1 waiting for hydrant relocation drawings. Appellant partially inverted its own schedule for unchanged work on phase 1 by postponing some concrete breakout work on laterals 5 and 6 and performing instead some work which appellant had not scheduled to take place until completion of all concrete breakout on those laterals. The work thus accomplished out of order would have been in the critical path of progress at a later date if not so executed. In addition appellant performed other unchanged phase 1 work that was not contingent on further concrete breakout.[16]

> * * * * * *

Mr. Meissen testified that all the above work was major under the contract and that in his conversations with Tri-Cor's site superintendent (Goetz) the latter never indicated that the work being done during this period was fill-in.

The plaintiff contends that none of this work materially advanced the performance of the contract, and that any findings of the Board that it did so, were not supported by substantial evidence. Slatton testified for Tri-Cor that each of the items of work discussed by the Board was relatively insignificant and that the breakout of the concrete in the hydrant boxes was a prerequisite to any meaningful progression.

The most that can be said for the contention of the plaintiff as to the character of the work that could be done during the July 31–August 14 period is that there was evidence in the record that would have justified the Board in concluding that the work done was or was not meaningful to the completion of phase 1. This was clearly a finding of fact to be made by the Board. The weight to be given to the evidence and the conclusions to be drawn therefrom were for the Board. Although the evidence was conflicting, there was substantial evidence in support of the Board finding that the contractor did not suffer any damage on account of the period of the delay. The court stated in Chaney & James Constr. Co. v. United States, 421 F.2d 728, 738, 190 Ct.Cl. 699, 717 (1970):

> * * * In such a situation, the court is inhibited by the first section of the Wunderlich Act from independently weighing the conflicting evidence in the administrative record for the purpose of ascertaining where the preponderance of the evidence lies.

> * * * * * *

The suspension of work clause of this contract [General Provision 30, at subsection (b)] provides in relevant part:

> (b) If, without the fault or negligence of the Contractor, the perform-

---

15. 68–1 BCA at 32,654.

16. *Id.*

ance of all or any part of the work is *for an unreasonable period* of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of the contract * * an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay * * *. [Emphasis added.]

An identical clause was recently interpreted by this court in the following terms:

> * * * the "suspension of work" provision of the contract distinguishes between a reasonable period of delay and an unreasonable period of delay. It is only in the less common situations, such as those in which the delay is due to defective specifications, that *all* of the delay is unreasonable. Consequently, not all of the delay [at issue] was necessarily unreasonable, even though plaintiff was at a critical stage of the work when the stop order was issued.

Chaney & James Constr. Co. v. United States, *supra*, 421 F.2d at 735, 190 Ct.Cl. at 712–13.

▇▇▇ The distinction between reasonable and unreasonable periods of delay incident to the issuance of changes to the contract specifications and drawings has, not surprisingly, been the object of frequent litigation. In the most recent pronouncement by this court referring to delays, it was observed that:

> * * * the mere fact that defendant took four weeks, or four months, or even longer, is in itself meaningless. The length of time is meaningful only in relation to the effect it had on the project operations * * * one month or even less might be unreasonable. * * *

Law v. United States, 195 Ct.Cl. 370, 384–385 (1971). What is a reasonable period of time for the government to do a particular act under the contract is en-

tirely dependent upon the circumstances of the particular case. Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 565, 174 Ct.Cl. 153, 170 (1966).

In F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 397, 131 Ct.Cl. 501, 506–507 (1955), where a government change order suspended all work on the changed portion of the contract and also on most other portions because they were dependent on the changed portions, the court scrutinized with care the time taken by the government and found a reasonable time to be quite brief. In other cases, however, where the contractor was able to mitigate the effects of delay by shifting to other portions of the contract work, quite lengthy delays have been found to be reasonable. *E. g.*, Continental Illinois Nat. Bank & T. Co. v. United States, 101 F.Supp. 755, 757, 121 Ct.Cl. 203, 242–243, cert. denied 343 U.S. 963, 72 S.Ct. 1057, 96 L.Ed 1361 (1952).

▇▇▇ In the instant case the Board found that the contractor was able, during the period of delay, to perform meaningful work that enhanced the completion of phase 1 of Item No. 1. This finding was supported by substantial evidence in the record. Therefore, the Board was entitled to conclude that Tri-Cor was not subjected to an unreasonable period of delay compensable under the suspension of work article. The further contention of the plaintiff that this conclusion by the Board was erroneous as a matter of law is without merit.

### IV. *The Acceleration Claim*

On July 16 and July 21, and again on September 11, 1964, the contracting officer notified plaintiff that contract performance was behind schedule and directed Tri-Cor to take whatever steps were necessary to meet the Item No. 1 completion date. In ASBCA 12031, plaintiff sought a price adjustment based on the additional costs that were incurred by Tri-Cor in compliance with these acceleration directives.

**132**

However, plaintiff's sole contention is that if it is found to be entitled to the time extension sought in ASBCA 11849, 11952, 11955 and 12001, then as of July 16, July 21 and September 11, it would have been ahead of a properly adjusted schedule. However, it has been determined that the Board properly denied these four claims. Plaintiff was not entitled to the claimed time extensions.

It follows that the Board properly denied plaintiff's appeal in ASBCA 12031.

### V. Remission of Liquidated Damages

Plaintiff claims (in ASBCA 12028) that if the time extensions demanded in ASBCA 11849, 11952, 11955 and 12001 are granted, it would have completed Item No. 1 on time according to a properly adjusted completion date. In that case it would have been entitled to remission of the liquidated damages assessed because of its failure to complete Item No. 1 by October 17.

However, the Board properly denied all the claimed time extensions. The Board, then, necessarily denied plaintiff's contentions in ASBCA 12028.

### VI. The Impact Claim

Plaintiff was not entitled to recover on any of its claims in ASBCA 11849, 11952, 11955, 12001 and 12031. *A fortiori,* it is not entitled to a total cost recovery based on the cumulative damages alleged by Tri-Cor incident to the substantive claims. The Board properly denied plaintiff's contentions in ASBCA 12030.

### CONCLUSION

The plaintiff's motion for summary judgment in opposition to the decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 11849, 11952, 11955, 12001, 12028, 12030 and 12031 is denied. The defendant's motion for summary judgment in support of the decision of the Armed Services Board of Contract Appeals on the same appeals is granted. The plaintiff's petition is dismissed.

59 CCPA