SEA CREST CONSTRUCTION
CORP., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 02–261C.

United States Court of Federal Claims.

Jan. 8, 2004.

Peter Goetz and Carl A. Haberbusch, Goetz Fitzpatrick LLP, New York City, for plaintiffs.

Shalom Brilliant, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Rita M. Fang, Office of Counsel, New York District Corps of Engineers, New York City, of counsel.

## OPINION AND ORDER

HODGES, Judge.

Sea Crest alleges that the Government breached plaintiff's contract by delaying approval of a final site plan for design and construction of family housing units at the United States Military Academy. Defendant filed a motion for summary judgment on liability, and plaintiff filed a Rule 56(f) affidavit requesting additional discovery. Defendant's motion for summary judgment is granted in part. Plaintiff's Rule 56(f) request is moot.

## BACKGROUND

### A. Request for Proposal

The Army Corps of Engineers issued a Request for Proposal and Specifications in February 1995, for design and construction of housing units at West Point. The contractor was to build 118 units in Phase One and design forty-two optional units. It would demolish existing housing units on the site in Phase Two. The contract required completion of site design prior to construction. If defendant exercised the option for forty-two additional units, the contractor would construct these units in Phase Three. A design that would accommodate 160 units was due within 135 days after the Notice to Proceed. All work was to be completed within 1000 days.

The RFP required that the site plan respect the architectural character of the area and be compatible with the environment. It directed the contractor to employ a design

that would discourage through traffic near the housing units. The Corps suggested homes clustered around cul-de-sacs or courts, avoiding excessively long or short loop streets. A site sketch attached to the RFP included the following caption: "A Main Circulatory Spine Acting as the Main Connector; Whereby the Buildings are in Cluster Arrangements Around Parking Courts."

### B. Sea Crest's Bid

Sea Crest submitted its first proposal May 25, 1995. Defendant responded on June 9, listing "numerous areas where your design either fails to address the requirements or provides data which indicates non-compliance." The letter required revisions to the proposal and a response no later than June 28, 1995. Plaintiff responded with two letters in July, adding "an allowance for 10,000 cubic yards of rock excavation for site trenching, building foundations, and general site cuts." The parties met to discuss the proposed site plan. A July 26 letter from defendant directed plaintiff to correct the deficiencies, remove the allowance for rock excavation, and submit a Best and Final Offer no later than July 27, 1995.

Plaintiff submitted a site plan with the July 27 Best and Final Offer showing 160 housing units in a six-pod layout with cul-de-sacs.[1] Plaintiff's BAFO included the assertion that "some revisions to the site plan will be necessary." Such revisions were to be made "in conjunction with the approval of the Army Corps of Engineers." Sea Crest bid $21,085,000 for design and construction of 118 units, $900,000 for demolition of the existing units, and $6,916,000 for the forty-two optional units. The Corps accepted plaintiff's BAFO on July 31, 1995 and approved the contract prices. It issued a Notice to Proceed on September 6, 1995.

### C. Site Plans

Plaintiff presented a site plan known as "Drawing No. 1" to the Government for the first time at a September 18, 1995 pre-work meeting. The new drawing proposed loop streets instead of cul-de-sacs and made other changes in the approved BAFO design. A copy of the BAFO transmittal letter stating that "some revisions to the site plan will be necessary" accompanied the Drawing. Drawing No. 1 "differed significantly" from plaintiff's BAFO according to defendant's Area Engineer, Mr. Passantino. It "depicted a big loop or ring around the mountain, comprised of long, looped streets." Mr. Passantino told plaintiff that it could present the drawing at the second pre-work meeting to be held on October 6, 1995.

Sea Crest displayed the new design at the second meeting as a large model that Mr. Passantino stated "was never validated as to any scale accuracy and the houses pasted on it were not at all designed until many months later." Government representatives were not happy with the proposed revisions. According to Mr. Passantino, Sea Crest agreed to "adhere to the concept of quad layout presented in their BAFO, and the Government agreed to be flexible about site geometries and quad size, and to be open to considering other ways in which Sea Crest might reduce rock cut and fill quantities." He thought that Sea Crest was satisfied with the Government's response and had no objection to the quad layout. Plaintiff did not submit the Drawing to the Contracting Officer, who did not attend either pre-work meeting.

Sea Crest submitted a number of site plans between September 1995 and July 1997. The Government rejected the plans for a variety of reasons, including budgetary concerns and the plans' noncompliance with RFP requirements. During that period, the Corps requested site plans for 160, 137, 131, and 118 housing units. The Corps announced its decision to build the contract minimum of 118 units in July 1997, twenty-two months after issuing the Notice to Proceed. By then, Sea Crest had nearly completed construction of the main road and two pods containing a total of sixty-two housing units. The Corps accepted thirty-two housing units in December 1997, thirty units in July 1998, and fifty-eight units in November 1998.

---

1. The terms Pod Layouts, Cluster Arrangements, and Cul-de-Sacs suggest similar designs or purposes.

Sea Crest submitted claims totaling $10,621,560 to the Contracting Officer in July 1999. These included claims for delay, breach of contract, breach of warranties of good faith and fair dealing, *quantum meruit*, unjust enrichment, and bad faith. The claims relate to defendant's rejection of Drawing No. 1 and its alleged failure to approve a final site plan in a timely manner. The Contracting Officer denied plaintiff's claims in April 2001.

## DISCUSSION

Plaintiff argues that the Corps' rejection of Drawing No. 1 was improper, and that its delay in approving a final site plan caused Sea Crest to incur delay damages. Defendant responds that plaintiff did not submit Drawing No. 1 to the Contracting Officer for approval, and in any event that rejection of an improper site design would not have been wrongful. Plaintiff's own inefficiency caused any delays in approving a site plan according to the Government.

Summary judgment is proper when the record shows no genuine issue of material fact. The moving party is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court will view the evidence in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### A. Drawing No. 1

■ Sea Crest contends that the Corps wrongfully rejected Drawing No. 1 because the drawing met "most" of the criteria for the site plan contained in the RFP. The letter that plaintiff submitted with its BAFO reserved the right to revise its BAFO site plan to Sea Crest. *See* BAFO Transmittal Letter, July 27, 1995 (stating that "some revisions to the site plan will be necessary"). However, Sea Crest did not have a unilateral right to alter its BAFO site plan. *See id.* (requiring "approval of the Army Corps of Engineers"). Revisions were to be consistent with the RFP and approved by the Contracting Officer.

Deficiencies in Drawing No. 1 were not minor or easily corrected. According to the RFP, the contractor was to avoid "rigid grid-iron-like streets" in favor of a layout that would "relate to the natural contours of the site . . . ." The contractor was to avoid long loop streets. Defendant wanted street patterns that would discourage vehicular traffic through housing areas. "Circulation plans based on cul-de-sacs are more desirable. Houses should be clustered around cul-del-sacs and courts whenever possible." Defendant wanted to limit the number of intersections, avoid four-way intersections, and minimize paved areas to preserve green space.

Drawing No. 1 differed from the BAFO site plan in important ways. It did not provide cul-de-sacs or avoid long loop streets. It did not include the cluster housing that the Corps wanted. The recreation area did not meet specifications because it called for construction near historic structures. The Corps was within its rights to reject drawings that did not meet contract requirements. *See, e.g., Cascade Pac. Int'l v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985) (stating that the Government has a right to insist upon compliance with contractual requirements). The revised BAFO plan did not comply with the RFP. The Corps did not reject Drawing No. 1 improperly.

### B. Delay

■ Sea Crest contends that the Corps' delay in approving a site plan that contained the number of housing units it needed caused construction inefficiencies. Defendant argues that Sea Crest had a duty to design and construct 118 units under the RFP. The Corps' option to increase the number of units did not alter plaintiff's responsibility to build at least 118.

The Corps did not approve a site design that contained at least 118 housing units until July 1997. Sea Crest submitted ten site plans before then, over a period of twenty-two months. During the same time, defendant insisted that Sea Crest begin construction on the main road and several housing

units. Defendant argues that Sea Crest's failure to provide a site plan that met RFP requirements caused its delay. Some site plans may not have met the contract requirements but this does not necessarily account for the Corps' tendency to shift the number of units to be designed. Such indecision may have prevented defendant's earlier approval of a site plan that included the contractual minimum of 118 units.

These issues depend on several factors, including whether defendant was responsible for the delay alleged, and whether such delay was unreasonable in the circumstances. "What is a reasonable period of time for the government to do a particular act under the contract is entirely dependent upon the circumstances of the particular case." *Tri–Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112, 131 (1972) (citing *Specialty Assembling & Packing, Co. v. United States,* 174 Ct.Cl. 153, 355 F.2d 554, 565 (1966)).

Defendant's decision to reduce the number of units could have affected plaintiff's ability to submit an acceptable site plan. For example, the Corps rejected a site plan for 137 units that plaintiff submitted in September 1996. Defendant gave budget restraints as the reason for reducing the units to 131. Whether this caused plaintiff delays or inefficiency, whether the Corps was the sole cause of such delays, and whether such delays hindered Sea Crest's performance of its contractual duties, are factual issues to be addressed at trial.

**CONCLUSION**

The Corps acted reasonably in rejecting Drawing No. 1. The Drawing did not meet the RFP criteria for the reasons stated. It is not clear that plaintiff protested defendant's dissatisfaction with Drawing No. 1. The record does not show that plaintiff submitted the Drawing to the Contracting Officer as required by the contract.

Defendant changed the required number of units several times. Sea Crest alleges that it had to design a new site plan each time the Corps altered its requirements. The Corps could reduce the number of units to the minimum 118, but it could not reject an otherwise valid site plan solely because its needs continued to change. Such equivocation may have caused inefficient, piecemeal construction and resulting delay damages. These are factual issues that depend on testimony and other evidence at trial, in light of the following legal considerations:

1. Sea Crest may recover delay damages if it proves that the Corps caused the alleged damages by failing to approve an otherwise acceptable site plan, and that Sea Crest was not concurrently responsible for the delay. *See P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1359–60 (Fed.Cir.2002) (citing *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984)) (holding that courts will deny recovery to a contractor if delays are concurrent and the contractor has not established delay that is attributable to the Government).

2. A trial court must apportion causes of delay between the parties, if applicable. *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982) (quoting *Coath & Goss v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944)) ("Where both parties contribute to the delay 'neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.' ").

3. The court may award delay damages only for the unreasonable portion of a government-caused delay. *P.R. Burke,* 277 F.3d at 1360 (quoting *Tri–Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112, 131 (1972)); *see also PCL Constr. Services, Inc. v. United States,* 47 Fed.Cl. 745, 801 (2000) (citing *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 425 (1993)).

Defendant's motion for summary judgment as to Drawing No. 1 is GRANTED. Defendant's remaining motions are DENIED. Plaintiff's Rule 56(f) motion is MOOT. The parties will contact the court during the week of January 12 to agree on a pretrial schedule.