**STUYVESANT DREDGING COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 3–85C.

United States Claims Court.

March 5, 1987.

Alexander W. Dann, Jr., Memphis, Tenn., for plaintiff.

Carol N. Park-Conroy, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

This case was brought directly before the court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) for the recovery of excess costs due to an alleged defective specification or differing site condition. Defendant requested that the Complaint be dismissed with prejudice.

## FACTS

On June 24, 1982, defendant, through the United States Army Corps of Engineers, awarded contract No. DACW 64–82–C–0036 to plaintiff for maintenance dredging of the Corpus Christi Ship Channel. Stuyvesant Dredging Company (SDC) was formed in 1980 to time charter the dredge STUYVESANT from Carlisle Dredging, Inc. Under a separate agreement, outfitting of the dredge, selection of the crew, and control of the day-to-day dredging op-

erations were the responsibility of Williams McWilliams, Inc. The STUYVESANT is a large hopper dredge with state of the art design. It was commissioned on June 11, 1982, two weeks before execution of the contract. The contract with SDC represented the first time that a commercial dredge had cleared the Corpus Christi Ship Channel.

During the time the Corpus Christi Ship Channel invitation for bids was under preparation, SDC bid on two other Corps' dredging projects, one at Sabine-Neches and the other at Freeport. In preparing bids on the two latter projects, the Chief of Operations of SDC and the Dredging Superintendent of the STUYVESANT reviewed records in Corps' offices of previous dredgings for both channels, removed physical samples of the materials that were to be dredged, and performed echo soundings of the channel bottoms.

SDC was awarded the Freeport contract. It was the first contract to be performed by the STUYVESANT and was not a total success in that the Corps eventually accepted less work than contracted for because SDC complained that it encountered virgin materials.[1]

During sea trials and while preparing to dredge the Freeport Channel, SDC prepared a bid for the Corpus Christi Ship Channel. However, unlike its bid preparations on the Sabine-Neches and Freeport projects, SDC did not review records of previous dredgings, did not take material samples or echo soundings and did not visit the job site.

The channel specifications in the Corpus Christi contract required that the channel be dredged to restore it to depths of 49 feet below mean low tide in one stretch and 51 feet for the remaining length. The channel was 600 to 700 feet wide and 20,500 feet long. The contract called for an estimated 1,028,000 cubic yards of material to be removed from the acceptable prism of the channel.[2] The prescribed prism[3] contained an estimated 1,970,000 cubic yards of material (including the 1,028,000 cubic yards in the acceptable prism) which, because of the inaccuracies of the dredging process, could be dredged for pay. The area beneath the prescribed prism was non-pay yardage meaning the Corps would not pay for material dredged from that area.

The stated purpose of the contract was to remove all shoaling that had accumulated since the channel was last dredged, *i.e.*, to restore the channel to the acceptable prism. Periodic dredging of this nature is termed maintenance dredging and, according to defendant, the last maintenance dredging was performed by the Corps of Engineers' dredge GERIG in 1978. There was, however, dredging performed in the Corpus Christi Ship Channel in 1981, following Hurricane Allen, by other Corps' dredges to open the channel to navigation. Defendant termed the latter "emergency dredging," designed to open the channel to shipping until the channel could be completely maintenance dredged to its acceptable prism. Neither the Corps nor the industry categorizes emergency dredging separately. Emergency and maintenance dredging are both considered maintenance dredging. A report commissioned by the dredging industry, called the "Gahagan Report," issued in December, 1980, contained a summarization of dredging of the Corpus Christi Ship Channel but did not distinguish between maintenance dredging and emergency dredging.

SDC based its bid upon the assumption that the 1981 dredging had reestablished the acceptable channel prism and that, therefore, the material to be dredged had been deposited in the last year and a half. Defendant disagreed with plaintiff's as-

1. "Virgin material" is earth that has never before been dredged in the history of any particular channel.

2. The "acceptable prism" is identical to the shape and size of the original channel and always remains the same.

3. The "prescribed prism" is beneath the acceptable prism. It is not uncommon to dredge from the prescribed prism, nor the non-pay areas, but defendant pays only for removal of material from the former and not the latter.

sumption on the basis that the 1981 emergency dredging had not returned the channel to its acceptable prism and that it was the purpose of the SDC contract to accomplish that particular goal. Defendant intended for plaintiff to dredge material that had been in place since the last "maintenance" dredging in 1978, and not just material deposited after the 1981 "emergency" dredging.

The contract provided, in pertinent part, as follows:

1–1.1. *Work to be Done*

1–1.1.1. The Work consists of furnishing all plant, labor materials and equipment and performing all work required by these specifications and the schedules and drawings ...

4–1 CHARACTER OF MATERIALS.

4–1.1 The material to be removed to restore the depths within the limits specified in Construction Technical Provision 1–1., DESCRIPTION OF WORK, is that composing [sic] of shoaling that has occurred since the channel was last dredged, however, some virgin material may be encountered in the prescribed prism, and/or side slope dredging. Bidders are expected to examine the site of the work and the records of previous dredging, which are available in the Galveston District Office, 400 Barracuda Essayon Building, Galveston, Texas 77553 and Corpus Christi Area Office, No. 3 Science Park, Corpus Christi, Texas 78401 and after investigation decide for themselves the character of the materials.

\* \* \* \* \* \*

4–1.3 *In-Situ Densities.* The following table details the results of a nuclear density survey conducted in the project area on 4 April 1979. The in-place density readings presented represent the average value of the density readings taken within the range indicated. The averaged values should not be interpreted as indicating the maximum or minimum density of material which may be encountered.

| Station | Channel Location | Density (kg/liter) | Density (lb./ft) |
|---|---|---|---|
| 210+00 | Centerline | 1.454 | 90.7 |
| 290+00 | N. Half | 1.380 | 86.1 |
| 170+00 | Centerline | 1.517 | 94.6 |
| 150+00 | S. Half | 1.422 | 88.7 |
| 130+00 | N. Half | 1.675 | 104.5 |
| 110+00 | Centerline | 1.372 | 85.6 |

\* \* \* \* \* \*

2. Changes

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing accordingly: Provided however, That except for claims based on defective specifications, no claim for any change under (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as therein required: And provided further, That in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with such defective specifications.

\* \* \* \* \* \*

4. DIFFERING SITE CONDITIONS

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract,

whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

The historical dredging records, which plaintiff was urged to review prior to bidding, filled several file drawers and included plans, specifications, past contracts and orders from previous dredgings by Corps' dredges as well as daily reports of operations, types of material dredged, before and after surveys and drawings, and soil sample data which included grain size analysis, density, and classification. Plaintiff did not avail itself of this wealth of information, although, with hindsight, it recognized that it would have been prudent to have done so. The contract, at Technical Provision 4–1.3, as quoted above, listed average densities for six locations in the channel, showing that on the average the density ranged from 1.372 kilograms/liter to 1.676 kilograms/liter. SDC used this sparse information, plus whatever general shoaling and material information it had gained from its bid preparations on the Sabine-Neches and Freeport projects, to compute its bid. However, SDC ignored both the Gahagan Report, which indicated densities in the 1.900 kilograms/liter range, and the Corps' dredging records.

SDC's bid was premised upon a plan to dredge 59,695 cubic yards of material a day at a cost of $1.19 per cubic yard and to complete performance in 33 days. After award of the contract, the Corps returned SDC's work plan and directed it to submit a work plan based upon the 120 days the Corps had allocated for completion of the project. SDC complied but nevertheless intended to complete the job in 33 days.

For the first several weeks, SDC met its daily dredging goal, but thereafter production dove to a very low level. The apparent reason for the production slowdown was that the STUYVESANT encountered large amounts of material that was difficult to dredge. Plaintiff contended that the STUYVESANT dredged large quantities of virgin material, but the Corps disputed that conclusion and told SDC that the material

being dredged by the STUYVESANT was the same type of shoaling material that Corps' dredges had encountered during previous dredgings to return the channel to its acceptable prism.

The STUYVESANT completed dredging in 57 days after removing approximately 2,218,000 cubic yards of material, including approximately 302,500 cubic yards from the non-pay area. The daily reports showed that the STUYVESANT dredged about 1,200,000 cubic yards of material with little difficulty and 800,000 cubic yards of material with great difficulty. Plaintiff believed that the 1,200,000 cubic yards of material that was easily dredged was mud overlying sand, however, inasmuch as plaintiff dredged all 1,970,000 cubic yards of pay-material and because of the nature of dredging, it necessarily would have also incidentally dredged hard-packed, virgin, non-pay material which would have been more difficult to dredge than the shoaling. No conclusion can be made by the court as a practical matter of the characteristics of the material dredged by the STUYVESANT, nor can any meaningful estimate be made of how much hard material was dredged in any one day or *in toto*. All that is really known is that hard material was encountered as evidenced by the fact that it was difficult to dredge. Teeth on the dredge hopper broke or bent while attempting to dredge the hard material and the "scrapers" wore out at a rapid rate.

SDC filed its claims for equitable adjustment based upon its interpretation of the contract, *i.e.*, that the STUYVESANT was only required to remove material that had shoaled following the 1981 emergency dredging, and that the material it removed had shoaled following the 1978 dredging which had compacted into hard and difficult material to dredge.

## DISCUSSION

*Differing Site Conditions Claim*

Plaintiff alleges that it is entitled to an equitable adjustment because it encountered a Type 1 differing site condi-

tion.[4] To prevail plaintiff must prove, by a preponderance of the evidence, that the conditions described or indicated in the contract were materially different from those encountered during performance. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984) (citing *Arundel Corp. v. United States*, 207 Ct.Cl. 84, 105, 515 F.2d 1116, 1128 (1975)). To determine whether the plaintiff has made such a showing, the court must place itself "into the shoes of a 'reasonable and prudent' contractor," *id.* at 917 (quoting *H.N. Bailey & Assocs. v. United States*, 196 Ct.Cl. 156, 163, 449 F.2d 387, 390 (1971), and decide if the conditions shown to be actually encountered were reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding. *Pacific Alaska Contractors, Inc. v. United States*, 193 Ct.Cl. 850, 863–64, 436 F.2d 461, 469 (1971). Plaintiff must also prove that it reasonably relied upon its interpretation of the contract and contract-related documents, and that it was damaged as a result of the material variation between the expected versus the encountered conditions. *Sanders Constr. Co. and Ray Kizer Constr. Co. v. United States*, 220 Ct.Cl. 639, 641, 618 F.2d 121 (1979).

■ This kind of claim stands or falls upon what is indicated in the contract documents. *Maffei*, 732 F.2d at 916; *Foster Constr. C.A. and Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 603, 435 F.2d 873, 881 (1970). "A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." 732 F.2d at 916 (citing *S.T.G. Constr. Co. v. United States*, 157 Ct.Cl. 409, 414 (1962)). The *Maffei* court went on to point out that the contract documents must contain "reasonably plain or positive indications" that subsurface conditions were different from what was actually found in order to sustain a differing site

condition claim. 732 F.2d at 916 (quoting *Pacific Alaska Contractors v. United States*, 193 Ct.Cl. 850, 863–64, 436 F.2d 461, 469 (1971)).

■ Plaintiff asserts that while dredging the Corpus Christi Ship Channel to remove shoaling that had accumulated since the channel was last dredged in 1981, plaintiff encountered material that was materially different from that depicted in the contract that it could not reasonably have known about. Plaintiff places much emphasis on the argument that the last maintenance dredging was done in 1981, and not 1978 as asserted by defendant. Defendant countered that it is not the date that is so important but the quantity of material that had shoaled in the acceptable prism. Expert testimony taken at trial has persuaded this court that there is no difference in the degree of difficulty of dredging shoaling whether it has been in place for a year (the 1981 dredging) or for four years (the 1978 dredging). The court finds that it is a widely accepted principle of soil mechanics and material consolidation that the density of granular materials changes very little with time once they are deposited, whereas the density of fine grain materials, such as silts and clay, does increase with time, which makes it correspondingly more difficult to dredge. However, the period of time required for a significant increase in density is very long, perhaps many years or decades.

The court also finds that the contract and the drawings gave no meaningful indication of the character of the material but merely an estimated quantity of material and its location. A wealth of information awaited review by prospective bidders in two Corps' offices but plaintiff chose not to avail itself of that information until the damage had been done. The court finds it difficult to understand why plaintiff failed to review the prior dredging reports, especially in light of the fact that by plaintiff's own computations, only 500,000 cubic yards

**4.** A Type 1 differing site condition exists when the contract specifications do not depict subsurface materials correctly, and the depicted material has properties substantially different from the encountered material.

of material had shoaled in the channel since 1981, whereas the contract called for removal of 1,028,000 cubic yards of material from the acceptable prism alone. The record also shows that plaintiff knew the 1981 dredging was "emergency" dredging. Faced with that knowledge, no reasonable, prudent bidder would have failed to discover whether the "emergency" dredging had returned the channel to its original prism. Armed with the knowledge that the 1981 dredging may not have returned the channel to its original prism, a reasonable bidder would have ascertained much more about the character of the material to be removed before bidding. Instead, plaintiff used the six average nuclear density readings set out at Technical Provision 4–1.3 and the results of its analyses of the materials at Sabine-Neches and Freeport to conclude that the material would be easy to dredge. It bid accordingly. The court finds this assumption by plaintiff to be inappropriate. The six average density readings were identified to be guides only. The clause clearly warned bidders that "the averaged values should not be interpreted as indicating the maximum or minimum density of material which may be encountered." The six nuclear density readings showed only the average density of material at six specific locations near the centerline of a channel encompassing an area 600–700 feet wide and 20,500 feet long. No pertinent information was given in the contract about the readings. Hence, the readings could not have provided a sound basis for determining the composition of the material, much less whether the material was fine, coarse, or whether it was even compacted. For plaintiff to have relied on those readings and not to have taken the time to review the data offered, even urged upon it by the Corps, was folly.

The court finds that the contract did not indicate or describe what material, or its characteristics, plaintiff would discover within the acceptable or prescribed prism. The only way plaintiff could have known prior to bidding was for it to have reviewed the prior dredging reports and taken samples from the channel, as it did in preparing

its bids on the Sabine-Neches and Freeport contracts. The court finds that a reasonable and prudent bidder would have taken the actions just described. Plaintiff has, for several reasons, failed to prove by a preponderance of the evidence that it encountered a differing site condition. No specific information about the material was described in the contract, thereby negating the application of the differing site condition clause, 4(a)(1) of the general provisions, that subsurface conditions differed from that indicated in the contract. Plaintiff cannot prove a differing site condition based upon the information in the files of the Corps because it never reviewed that information until the contract was nearly completed, but more importantly the Corps' records accurately reflected the character of the material encountered by other dredges. In view thereof, it is disingenuous for plaintiff to allege it was damaged as a result of any variance between the material described in the contract or different from what would be normally expected. *See P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913 (Fed.Cir.1984) (where the contract cautions bidders that information contained in the contract documents may not accurately depict encountered conditions, plaintiff may not rely on that information to its own detriment). In *Vann v. United States,* 190 Ct.Cl. 546, 420 F.2d 968 (1970), the court held:

> It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract.

*Id.* at 571–72, 420 F.2d at 982.

Plaintiff's claim that it is entitled to an equitable adjustment because it encountered a Type 1 differing site condition is without merit and is denied.

### Defective Specifications Claim

■ Following the United States Court of Claims' opinion in *Hol-Gar Mfg. Corp. v. United States,* 175 Ct.Cl. 518, 360 F.2d 634

(1966), the Armed Services Board of Contract Appeals held in *Consolidated Diesel Electric Corp.*, ASBCA 10486, 67–2 BCA ¶ 6669 (1967), that the government impliedly warrants the adequacy of its specifications based upon its responsibility for the specifications. The warranty is a promise to indemnify the contractor for any loss if the fact warranted proves untrue. *Id.* at 30, 951–52. *Dale Constr. v. United States*, 168 Ct.Cl. 692, 699 (1964) (citing *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir.1946)). Before applying the implied warranty of specifications test, it must be determined whether the problem facing the contractor was, in fact, caused by a government design specification or clause. The implied warranty of adequacy of specifications applies only to design specifications such as detailed measurements, tolerances, materials, *i.e.*, elaborate instructions on how to perform the contract, etc. In *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), the court held that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136, 39 S.Ct. at 61. Performance specifications provide operational characteristics and leave the details of how to comply with the contract up to the contractor. The contractor is given general discretion and election as to how to meet its contractual obligations. *Monitor Plastics Co.*, ASBCA 14447, 72–2 BCA ¶ 9626 (1972). There is no such warranty of adequacy of the specifications in the latter instance. *See J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 709, 412 F.2d 1360, 1374 (1969).

 Plaintiff argued that the alleged factual error (the statement in 4–1.1 that material to be removed was shoaling) rendered the specification inadequate for the task at hand. That "task at hand" was for the Corps to provide correct information of the character of the material to be encountered in order to enable plaintiff to properly prepare its bid. The answer has already been stated; the court has found that shoaling is shoaling, and the fact that the

shoaling may have built up from 1978 or 1981 is of no consequence vis-a-vis the difficulty of dredging, under the circumstances of this case. There is no dispute that some of the material was difficult to dredge, but the contract envisaged that fact. Plaintiff dredged material with densities up to, if not more than, 1.9 kilograms/liter. That eventuality was predictable from the Corps' records and the Gahagan report. Plaintiff's reliance upon the six average densities set forth at clause 4–1.3 was not reasonable because bidders were specifically warned that those average densities "should not be interpreted as indicating the maximum or minimum density of material which may be encountered." *Vann v. United States*, 190 Ct.Cl. 546, 420 F.2d 968 (1970).

Whether the shoaling occurred after the 1978 dredging or the 1981 dredging, the fact remains that plaintiff was contractually obligated to the Corps to provide a channel prism of specific dimensions by dredging material similar to that dredged in the past by Corps' dredges. How plaintiff accomplished that goal was entirely up to plaintiff. Plaintiff's argument that much of the material was compacted fine sand, and entirely different from the material specified in Technical Provision 4–1.1 and Technical Provision 4–1.3 does not hold water. Technical Provision 4–1.1 merely states that the material to be dredged is shoaling that had occurred from the last dredging; there is no reference to "compacted fine sand" in the specifications. Contrary to plaintiff's assertions, the court finds that Technical Provision 4–1 was not defective because it did not provide "incorrect information about the character of material to be encountered," nor is it a detailed type specification for which the government might be liable under the defective specification theory. The court is satisfied that Technical Provision 4–1 was a "performance" type specification for which the government does not warrant accuracy or adequacy. Even assuming, *arguendo*, that the listed densities in Technical Provision 4–1.3 did provide an estimate of the

character of the material, the strong disclaimers that the six averaged densities could not be used to identify the density of all the material clearly negated any possible warranty of adequacy for any purpose other than a determination of what might exist at those six specified sites. In the case before the court, the six average densities do not reach the level of estimates and are clearly not facts upon which plaintiff could rely. The disclaimer is explicit and unambiguous. The government did not warrant the density or character of the shoaling so as to permit a breach of warranty based upon a defective specification. *Webco Lumber, Inc. v. United States*, 230 Ct.Cl. 457, 677 F.2d 860 (1982).

Plaintiff also contended that an ambiguity existed in the technical specifications which should be resolved in plaintiff's favor. The alleged ambiguity is directed at an issue already discussed in great detail, that is, whether the language of the contract that the material to be dredged "is that composed of shoaling that has occurred since the channel was last dredged" may reasonably be interpreted to mean the 1978 dredging or the 1981 dredging. It is obvious that plaintiff interpreted that phrase to mean the 1981 dredging and defendant the 1978 dredging. In some instances a court will find that a disputed contract clause is susceptible of more than one reasonable interpretation. In those instances the ambiguity will generally be resolved by resort to the rule of *contra proferentem*, a rule of contract interpretation which places the risk upon the party drafting the language, the creator of the ambiguity. Application of the rule is predicated upon the reasonableness of plaintiff's and defendant's varying interpretation. *W.P.C. Enter., Inc. v. United States*, 163 Ct.Cl. 1, 6–7, 323 F.2d 874, 876–77 (1963); *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418 (1947). The government must bear the burden if it is the drafter of the challenged language, however, plaintiff must also shoulder some responsibility. *W.P.C.*, 163 Ct.Cl. at 6, 323 F.2d at 877. If there is an ambiguity and the ambiguity is patent, the contractor must resolve the am-

biguity before bidding. Failure to do so negates the general rule. *S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 128, 546 F.2d 367, 369 (1976). The quandry faced by the court is to determine first whether an ambiguity genuinely exists and, second, if so, whether the ambiguity was patent or obvious prior to the dispute. In *Blount Bros. Constr. v. United States*, 171 Ct.Cl. 478, 346 F.2d 962 (1965), the court stated the following:

> [C]ontractors are business men, and in the business of bidding on Government contracts they are usually pressed for time and are consciously seeking to underbid a number of competitors. Consequently, they estimate only on those costs which they feel the contract terms will permit the Government to insist upon in the way of performance. They are obligated to bring to the Government's attention major discrepancies or errors which they detect ... or else fail to do so at their own peril.

171 Ct.Cl. at 496, 346 F.2d at 972–73.

In the case at bar, the controversy swirls about Technical Provisions 1–1.1 and 4–1.1, *supra*. As we know, Technical Provision 1–1.1 requires plaintiff to dredge the channel to the acceptable prism. Technical Provision 4–1.1 strongly urges bidders to visit the site, examine the records of previous work, and advises that the material to be removed to restore the depths as indicated in clause 1–1.1 is shoaling that occurred since the channel was last dredged. The court finds that clause 4–1.1 could lead to two defensible interpretations. That being the case, the court would have to rule for plaintiff but for the fact that the ambiguity was patent and obvious. Even though the Corps and the industry may not officially recognize a difference between normal "maintenance" dredging and "emergency" dredging, it would be ludicrous to assume that there was, in fact, no difference. Plaintiff knew of both dredgings and, in the opinion of the court, was under a duty to inquire into which "last dredging" defendant meant. This is especially true in light of the fact that the

contract called for removal of more than twice as much material as plaintiff computed it would have to dredge. Plaintiff knew that Clause 1–1.1 required dredging to a set depth and width and it knew, or should have known, that the emergency dredging of 1981 might not have completely cleared the channel to its acceptable prism. By failing to question the Corps, plaintiff has lost the right to the rule of *contra proferentem*. The specifications did not mislead plaintiff. If plaintiff was misled, it was the result of its own unreasonable assumptions and actions. *See S.O.G. of Arkansas v. United States*, 212 Ct.Cl. 125, 130–31, 546 F.2d 367, 370–71 (1976).

The court finds that the contract did not indicate or describe what material plaintiff would discover within the acceptable or prescribed prism but it did state the estimated amount of material that would have to be dredged. The argument itself is without merit because as the court has found it made no difference in this instance how long the shoaling had been building up.

The court finds that the challenged specifications did provide for equally valid, but opposing interpretations as to the date of the last dredging, but that the ambiguity was meaningless, and most certainly obvious. Plaintiff's obligation to rectify the ambiguity prior to bidding negates the ambiguity, as well as its entitlement to an equitable adjustment based upon thereon. *See id.*

## CONCLUSION

After an exhaustive review of the facts of this case, arguments of counsel and authorities cited in support of the various positions, the court concludes that plaintiff encountered neither a Type 1 differing site condition nor a defective specification. Neither can it benefit from the ambiguity in the technical specifications. The problems encountered by plaintiff cannot be laid at the door of defendant but must be borne solely by plaintiff. The Clerk of the court is directed to dismiss the Complaint with prejudice and enter judgment in favor of defendant. Costs to defendant.