CCM CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 599–86C.

United States Claims Court.

June 8, 1990.

Donald L. Conn, Jr., Woburn, Mass., attorney of record, for plaintiff. Conn, Austin, Conn & Senior, of counsel.

Evelyn M. Korschgen, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. David M. Cohen, Director, and Stephen J. McHale, Asst. Director, of counsel.

## OPINION

FUTEY, Judge.

This case is before the court after a trial on the merits. Plaintiff, a construction contractor, claims that the presence of tar beneath a concrete walkway constitutes an unanticipated site condition which entitles it to an equitable adjustment of a contract price. In addition, plaintiff requests compensation for performance delays allegedly caused by defendant from approximately June 1, 1983, until "sometime" in October 1983. In response, defendant asserts that plaintiff has failed to demonstrate that the tar-based waterproofing system is materially different from the known and usual system. Furthermore, defendant argues that plaintiff is entirely responsible for the claimed contract delay.

### Factual Background

This government contract case involves the refurbishment of an enclosed walkway between two buildings at a Veterans Medical Center (VMC). At issue is the "differing site conditions" contract provision as it applies to the performance of the re-waterproofing of the enclosure. This case first came before the court on September 25, 1986. Subsequently, this court entered an Order which granted defendant's motion for partial summary judgment.[1]  *CCM Corp. v. United States*, 15 Cl.Ct. 670 (1988). The statement of facts made in that earlier order will be elaborated here.

Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principle place of business in Methuen, Massachusetts. Prior to the submission of its bid, plaintiff's president and an estimator for plaintiff made a visual inspection of the site. However, they did not inquire about the nature of the existing waterproofing system. Plaintiff did not attend the pre-bid conference and official pre-bid inspection held on February 10, 1983.

On March 10, 1983, plaintiff submitted its bid on the firm-fixed price contract.[2] At

---

**1.** This court dismissed that part of plaintiff's claim for lost profits. *CCM Corp. v. United States,* 15 Cl.Ct. 670 (1988). Plaintiff based this claim on the potential profits that it could have derived from another contract had defendant not delayed in releasing corporation's perform-

ance bond for the contract. *Id.* at 671. This court held that these profits were "consequential damages," and thus could not be recovered. *Id.* at 672.

**2.** According to the Federal Acquisition Regulations, a firm fixed-price contract is not subject

that time plaintiff did not know what type of waterproofing existed on the structural concrete surface. Based solely upon its president's prior experience, plaintiff expected that the existing waterproofing system was asphalt. Plaintiff intended to use Jacor, Inc., as a waterproofing subcontractor. Plaintiff's bid proposal indicated the hot rubberized asphalt system to be used was Firestone No. 6125.[3]

On May 3, 1983, plaintiff entered into the contract with defendant. Plaintiff's duties were to furnish all the materials and perform the work for insulating and waterproofing existing connecting corridors for the Veterans Administration (VA) Medical Center at Brockton, Massachusetts, in strict accordance with the plans and specifications,[4] for the price of $409,450.00. Specifically, the contract provides for plaintiff to furnish all labor, material, equipment and appurtenances necessary for the removal[5] of the existing concrete wearing slab and fence on the connecting corridor

roof walk, the replacement of the wearing slab with a new concrete wearing slab and new fence, the removal and replacement of the existing roofing, insulation and fencing on the connecting corridor roof walk, the furnishing of planting material, the installation of new fence support benches, free standing benches, planters, trash receptacles and ash urns.[6] The work was to be finished within 180 calendar days from the receipt of the notice to proceed, which was received by plaintiff on May 23, 1983. Thus, the completion date of the contract was November 19, 1983. Change orders,[7] as requested by plaintiff and issued by the defendant, extended the completion date to June 11, 1984.

The contracting officer (CO) issued the notice to proceed on May 18, 1983. Plaintiff acknowledged receipt of the notice on May 23, 1983.

On or about June 2, 1983, plaintiff commenced sawcutting the connecting corridors and encountered an existing tar pitch

---

to price adjustment based on performance costs. See 48 C.F.R. § 16.202–1 (1984). The contractor assumes "maximum risk and full responsibility for all costs and resulting profit or loss." *Id.* Thus he has maximum incentive to control costs and perform effectively.

3. Firestone No. 6125 is not the name of any waterproofing system; it is a mistake. Firestone is a reference to a potential manufacturer, and No. 6125 refers to a product associated with a competing manufacturer, Uniroyal. Plaintiff asserts that it actually based its bid proposal on Bakelite–Flintlastic 790–11, hot rubberized asphalt waterproofing system.

4. Section 1.1–"SUMMARY OF WORK," provides in part:

The drawings and specifications indicate the scope and the intent of the work to be performed. It shall be the Contractors responsibility to coordinate and execute all aspects of the project. Before submitting bids, it is recommended potential contractors visit and carefully examine the site, existing building, existing equipment to be removed and/or replaced, and other areas so as to familiarize themselves with existing conditions and difficulties that may affect the execution of the work. The Contractor shall compare the drawings and specification with the result of his site examination and include adequate allowance in the bid to fulfill all requirements which can be detected from a careful site examination. *No allowance will be made at a later date for the contractors failure to detect*

*discrepancies, difficulties, or other problems that would have been made apparent by a through site examination.* Times and date for site examinations have been established by the Medical Center and are indicated in the Invitation for Bids.

[Emphasis added.]

5. Section 02060, page 2, provides in part:

*Demolition: Demolish* slabs, roofing, *waterproofing,* fencing and associated building elements *completely* and remove from site. Use such methods as required to complete work within limitations of governing regulations. Special care shall be taken not to damage the structural slab scheduled to remain.

[Emphasis added.]

6. The construction schedule required the removal of the fence, the concrete walk and the existing waterproofing, before the re-waterproofing could be performed. Afterward, the insulation, the walk, the fence, and then the landscape, in that order, would be accomplished. According to plaintiff's uncontroverted testimony, the work had to be performed in that sequential manner.

7. A change order request is used by a contractor to receive compensation for something not in the contract that was done or needed. The original contract price was increased to $452,034.84, by change orders A through H. Plaintiff has received payment for all work associated with each change order.

waterproofing system. Unfortunately, the waterproofing system plaintiff intended to use, asphalt, cannot be applied on a surface previously exposed to tar without expensive decontamination procedures. Thus, the demolition expenses under the contract would cost more than plaintiff intended to pay. This is the essence of the case. Consequently, plaintiff claims that this system is incompatible with the hot-applied rubberized asphalt system upon which its bid was based.[8] Plaintiff immediately advised the CO's Technical Representative (TR) of the allegedly unanticipated site condition.[9]

On June 7, 1983, plaintiff submitted to defendant for approval, pursuant to the contract,[10] an asphalt waterproofing system, Bithuthene Waterproofing Systems.[11] On June 14, 1983, plaintiff submitted for approval a sample and specifications for the material Bithuthene 3000 (Bithuthene). On June 21, 1983, defendant approved Bithuthene subject to the condition that the manufacturer grant the 10–year warranty as required by the contract specifications. A few days later, plaintiff submitted yet another type of waterproofing material, Flintlastic,[12] as the intended waterproofing material. This was approved by the defendant, pursuant to the contract, on July 7th, 1983.

Immediately after the 7th of July, it is not clear what transpired between the parties. Plaintiff claims that it was trying to resolve the tar question with defendant. Defendant denies this and asserts that plaintiff was "shopping around" for lower priced waterproofing materials than those already approved. In any event, numerous prime weeks for re-waterproofing were lost. On August 1, 1983, defendant wrote to plaintiff:

> This is to inform you that the specifications under Section 02060–Demolition

---

8. Plaintiff's basis for this assertion is provided in the contract, section 07120, page 1, provides in part:

   Include as the major part of the work the waterproofing of the structural slab supporting new concrete wearing slab surfaces.
   This specification is based on hot, rubberized-asphalt type of waterproofing membrane applied directly to the structural concrete surface.

9. The contract contained the standard "Differing Site Conditions" provision (Aug. 1979 edition). This provision provides, in pertinent part:

   (a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, and equitable adjustment shall be made and the contract modified in writing accordingly.
   The contract also contained a "Suspension of Work" clause. This clause provides, in pertinent part:

   (b) If the performance of all or any part of the work is, for an unreasonably period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable time), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor....

10. Pursuant to the contract, plaintiff was required to submit to the defendant for approval any waterproofing system not listed in the contract. Since Firestone No. 6125, the named waterproofing system on plaintiff's bid does not exist, plaintiff was required to make a submission.

11. Section 07120, page 1, provides in part:

    *General Compatibility:* Provide products which are recommended by manufacturer to be fully compatible with indicated substrates.

12. Plaintiff claims that this is the type of material it intended to include with its bid.

must be complied with. The deck must be completely stripped of all remaining slabs, roofing, waterproofing, fencing and associated building elements and tar pitch so that the surface is acceptable to begin new membrane application.[13]

On August 25, 1983, plaintiff submitted yet another change order request for a waterproofing system. This time, plaintiff requested the waterproofing system Rhoflux. On September 1, 1983, the CO denied plaintiff's request for the use of Rhoflux and directed plaintiff to proceed with the contract work under the schedule utilizing Bithuthene. On September 9, 1983, plaintiff submitted a request for change order No. 6 seeking $22,865.00 and a 60–day extension of time for alleged material and labor costs associated with the use of Bithuthene.

On September 15, 1983, plaintiff met with representatives of W.R. Grace and Company (Grace), the manufacturer of Bithuthene. They told plaintiff of its requirements for issuance of a guarantee for the use of Bithuthene. On September 16, 1983, Grace advised plaintiff that it was prepared to offer a 10–year warranty.[14] Plaintiff then submitted a change order for the alleged costs associated with Bithuthene and a warranty. The CO denied plaintiff's request on September 23, 1983.

On October 3, 1983, plaintiff submitted a revised claim totaling $48,584.00 for costs associated with the use of Bithuthene, which was denied by the CO on January 30, 1984.

On June 20, 1984, plaintiff submitted its first request for approval of the trash receptacles and ash urns.[15] On July 2, 1984, plaintiff submitted a request for approval of Landscape Form trash receptacles and ash urns. Plaintiff acknowledged that the receptacles and urns had not been ordered on August 16, 1984, and alleged it was awaiting a decision from the VA regarding a proposed change of these items. Plaintiff submitted a change in the specification number of the trash receptacles and ash urns on August 29, 1984, and noted that a 60–day shipment time remained. On September 4, 1984, the CO approved plaintiff's submittal for use of Landscape Form trash receptacles and ash urns.

On May 25, 1984, and on June 7, 1984, the CO forwarded to plaintiff letters outlining 10 and 25 items, respectively, that must be completed prior to issuance of a final punch list pursuant to the contract. On July 25, 1984, plaintiff requested an inspection and a final punch list relating to this job. On August 1, 1984, the CO sent to plaintiff a cure notice outlining numerous conditions remaining to be corrected or performed. On September 6, 1984, the CO provided a punch list to the plaintiff.

The date of the final inspection, contract completion and the beginning of the guarantee period was February 25, 1985.

On June 10, 1985, plaintiff filed a claim for an equitable adjustment for increased material costs in the amount of $48,584.00 and for delay damages for a one-year period and lost profits totaling $147,900.00. Plaintiff certified its claim on July 22, 1985. The CO issued a final decision on September 27, 1985, denying plaintiff's claim.

Plaintiff filed a complaint in this court, challenging the CO's decision, on September 25, 1986. By Order dated November 14, 1988, this court granted defendant's motion for partial summary judgment as to plaintiff's claim for $70,000.00 in lost prof-

---

13. See *supra* n. 6.

14. Section 07120, page 2, provides in part:
   Provide written warranty, signed by Contractor and Installer, agreeing to replace/repair defective materials and workmanship, defined to include leakage of water, abnormal aging or deterioration of materials, and other failures of membrane waterproofing to perform as required within warranty period. * * * Warranty period is 10 years after date of substantial completion.

15. Section 06100, page 3, provides in part:
   *Trash Receptacles:* Equal to Landscape Forms Model 5.1C 2429 (square), complete with liner system.
   *Ash Urns:* Equal to Landscape Forms Model 6.1C 1520 (square), complete with insert.
   Contractor shall provide one ash urn per bench and one trash receptacle per seating group, for a total of 20.

its. Trial was held on the remaining issues in Boston, Massachusetts, on December 5, 1989. Post-trial briefs were filed by both parties on February 26, 1990.

Plaintiff claims that the presence of tar beneath the concrete walkway constitutes an unanticipated site condition which entitles it to an equitable adjustment of the contract price, pursuant to paragraphs 2, 4 and 33 of the General Conditions of the contract. Plaintiff contends that it prepared its bid based on the representations made in the contract, such as the listed products [16] which suggested that the waterproofing surface to be removed was asphalt based and would not require expensive decontamination. Plaintiff claims that the fair and reasonable value of the extra work is $48,584.00.

In addition, plaintiff requests compensation for performance delays allegedly caused by defendant from approximately June 1, 1983, until "sometime" in October 1983, "when [plaintiff] chose to proceed with the work despite the failure of the Veterans Administration to address the unanticipated site condition." The damages claimed are the costs associated with contract performance during winter which total $34,376.00.[17]

Defendant asserts that plaintiff has failed to demonstrate that the tar-based waterproofing system is materially different from the known and usual system. Furthermore, defendant argues that plaintiff is entirely responsible for the claimed contract delay.

The issues are: Whether the presence of tar is an unanticipated site condition such that plaintiff would be entitled to reimbursement under the equitable adjustment clause of the contract? If so, then is defendant liable to plaintiff for the associated contract delays? Jurisdiction is proper here under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1982). *See Shank–Artukovich v. United States*, 13 Cl.Ct. 346 (1987), *aff'd*, 848 F.2d 1245 (Fed.Cir.1988).

## Discussion
### Differing Site Conditions

Plaintiff's first claim is for costs associated with the use of Bithuthene. Specifically, plaintiff wants the decontamination costs spent to receive a warranty on the re-waterproofing. In general, recovery for such a claim has been described as limited to "those contractors that are justifiably surprised by what they find," *Fort Mechanical, Inc.*, GSBCA No. 6360–FBB, 83–2 B.C.A. (CCH) ¶ 16,740, 1983 WL 13110 (July 18, 1983). The provision authorizing recovery is the standard "Changes" contract clause, which authorizes claims for two types of changed conditions, often called category one and category two. *See Foster Constr. C.A. & Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 594, 435 F.2d 873 (1970). *Servidone Constr. Corp. v. United States*, 19 Cl.Ct. 346 (1990). The purpose of this clause is to provide defendant with more accurate bids by discouraging inflation for risks that may not eventuate. The clause eases the contractor's burden of risk assessment and site investigation. *Foster Constr.*, 193 Ct.Cl. at 613–14, 435 F.2d 873. Differing site conditions can occur in two circumstances: Conditions differing from the contract indications (category one) and those differing from conditions normally encountered (category two). The threshold consideration is a proper

**16.** Section 07120, pages 2 and 3 provides in part:

*Products:* Subject to compliance with requirements, provide one of the following:
Alasco RAM; Alasco, Inc.
Firestone WP Sys. Membrane; Concrete Sealants, Inc.
Liquid Membrane 6125; Uniroyal Const. Products.
Or approved equals.

**17.** Defendant issued the following extensions of time:

(1) a 30–day extension dated September 26, 1983, due to defendant's delay in approving change orders A, B, and C, (2) a 115–day extension dated February 20, 1984, due to adverse weather conditions, (3) a 30–day extension pursuant to Amendment E dated February 17, 1984, and (4) a 20–day extension pursuant to Amendment G dated June 2, 1984. Plaintiff originally sought delay damages associated with each time extension. However, at trial and in its post-trial brief, plaintiff claims only for the delay damages of winter construction.

classification of plaintiff's claim. Plaintiff fails to mention which category it is asserting. In contrast, defendant argues exclusively that plaintiff is asserting a category two claim.

Plaintiff claims that the underlying tar based waterproofing system was not disclosed by defendant in the plans, specifications, or at the pre-bid conference referred to in the contract. Plaintiff asserts that the contract specifications required asphalt based waterproofing material. All suggested waterproofing materials listed in the contract were asphalt based. Plaintiff concludes that nothing in the contract indicated compatibility with tar based systems. Finally, plaintiff notes that defendant failed to provide "as built" drawings. These presumably would indicate tar. These contentions involve reliance on the representations made in the contract or implied by the contract concerning the subsurface conditions. This is colorably a category one claim.

■ To prevail on a category one differing site condition claim, plaintiff must prove that it encountered subsurface or latent physical conditions at the site that differed materially from those expressly or impliedly indicated in the contract. "[T]here were such indications [in the contract] which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered." *Pacific Alaska Contractors, Inc. v. United States*, 193 Ct.Cl. 850, 436 F.2d 461 (1971), citing *United Contractors v. United States*, 177 Ct.Cl. 151, 161–64, 368 F.2d 585 (1966); *Foster Constr.*, 193 Ct.Cl. at 587, 435 F.2d 873. The court must view itself as a reasonable and prudent contractor and decide whether the site condition was reasonably unforeseeable at the time of the bidding, in light of all then available knowledge. *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 858, *aff'd*, 834 F.2d 1576 (Fed.Cir.1987).

■ In contrast, the category two claim is awarded when the contractor encounters "unknown physical conditions, at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." *See Shank–Artukovich*, 13 Cl.Ct. at 350, n. 14. Under category two, defendant must elect not to presurvey and represent the subsurface conditions. Consequently, a claimant must demonstrate that he has encountered something materially different from the "known" and the "usual." *Shank–Artukovich*, 13 Cl.Ct. at 350, citing *Charles T. Parker Constr. Co. v. United States*, 193 Ct.Cl. 320, 333–34, 433 F.2d 771 (1970). Defendant argues that plaintiff's claim is a "classic category two claim."

After reviewing the law, the facts and the contentions of the parties, the court finds that plaintiff's claim is most accurately classified as a category one claim. The court agrees with the parties that no express representations concerning subsurface conditions was made in the contract. This would support a finding that a category two claim rather than category one type is present. However, the contract, at least by implication, refers to the subsurface conditions. The type of waterproofing material required by the contract was asphalt based which is not compatible with tar. The plans, specifications, and drawings, which are referred to by the contract, do not refer to any possible existence of tar. In addition, plaintiff notes that the suggested waterproofing products in the contract were all asphalt based waterproofing material. These factors support an inference that the underlying waterproofing system was asphalt based. Furthermore, the court notes that while the contract refers to "demolition" and removal of the existing waterproofing system, it doesn't specify decontamination. This omission is important since the cost of decontamination is substantial, especially relative to the price of waterproofing itself. Finally, the contract provision requiring a warranty does not indicate anything which suggests a decontamination procedure was necessary. Consequently, the basis of plaintiff's argument is a reliance upon the implied contract indications. None of plaintiff's assertions singularly lead this court to this

characterization; however, collectively they do.

### Implied Contract Indications

■ The question here is whether the contract representations led to implications that plaintiff could justifiably rely upon "that subsurface conditions would be more favorable than those encountered." *Servidone Constr. Corp.*, 19 Cl.Ct. at 359–60 (citation omitted). The contract required an asphalt based waterproofing system. The contract contained a list of exclusively asphalt based products. Nothing was stated in the contract, or in documents referenced to it, such as the specifications, to suggest that the subsurface conditions contained a tar based waterproofing system. These are sufficient indications that tar would not be present and "conditions would be more favorable than those encountered." *Pacific Alaska Contractors*, 193 Ct.Cl. at 864. Furthermore, the court notes plaintiff's president's testimony that it was his company's practice to incorporate the bids of subcontracts in the bid without verification (Transcript (tr.) at 26). In addition, the president's testimony that it is common for contractors to bid on re-waterproofing jobs without taking a subsurface sample stands unrebutted (tr. at 30, 31). Finally, while it is true that plaintiff could have gone to the pre-bid conference and asked about the subsurface conditions, nothing concerning the existing waterproofing system was mentioned there. Plaintiff testified that if a new substantial problem in the contract was revealed at one of these meetings, the non-attendees would be notified. The Court finds this testimony credible and persuasive.[18]

In response, defendant argues that the contract requires plaintiff to remove the existing waterproofing system in its entirety. According to defendant, this would contemplate the decontamination proceeding.[19] However, decontamination is a separate operation. It varies in cost depending on the extent of contamination and the requirements of the manufacturer's warranty requirements. It is substantial expense, about 10 percent of the total contract award. Plaintiff justifiably relied on the contract implications that such a substantial expense would not be necessary.

### Damages

■ Plaintiff's claim for count one is for $48,584.00. Plaintiff submits a photocopy of a letter, signed by plaintiff's president, that was submitted to the CO. It breaks down the elements of the re-waterproofing cost. Plaintiff based this figure on the subcontractors revised quote, which reflected the additional cost due to the decontamination. The testimony of plaintiff's president, at trial, supports this amount.

■ In response, defendant cautions the court that while the amount of damages need not be quantified with mathematical precision, plaintiff's evidence must support its claim for damages and demonstrate governmental action as the cause. Furthermore, defendant urges the court to carefully scrutinize the figures used by plaintiff in support of its claims and determine if the figures used by plaintiff and its method of calculation are correct and in

---

**18.** No mention of the tar based waterproofing condition was made at the pre-bid conference. Plaintiff testifies about it:

A. I didn't see any need to go to it. I didn't see anything strange about the job. I thought it was a pretty cut and dried job, and if there's anything that comes up at a—I didn't have any questions to ask, really, and that's what a pre-construction conference is. We have a question and answer period. And if someone else had a question and it was important, it would come out to us in a letter or an addendum.

(Transcript (tr.) at 27).

**19.** In a letter to the Veterans Administration (VA), defendant's expert states:

The specifications explicitly require the existing waterproofing to be removed as part of the demolition operations. ("Demolish slabs, roofing, waterproofing, fencing and associated building elements *completely* ...").

The demolition of existing waterproofing on existing structural slabs is a common operation in re-waterproofing projects such as this one. It is typically accomplished using a Tennant L–9 or K–4 scarifier machine which removes only the top surface of the concrete to a depth of not more than $1/16$". The cost of this operation varies: a budget figure for this project would be between $.50 and $.75 p.s.f.

compliance with applicable precedent. *See Fortec Constructors v. United States*, 8 Cl.Ct. 490, 508–09 (1985), *aff'd*, 804 F.2d 141 (Fed.Cir.1986). In its calculation of damages, plaintiff must at least adduce sufficient evidence to enable the court to make a fair and reasonable approximation. *E.g., Specialty Assembling & Packing Co. v. United States*, 174 Ct.Cl. 153, 184, 355 F.2d 554 (1966); *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987).

The court is persuaded by plaintiff's evidence. Defendant does not challenge the accuracy of the figures claimed by plaintiff for decontamination. In addition, plaintiff's assertions as to the additional costs for re-waterproofing with Bithuthene are supported by defendant's own expert. This expert stated that decontamination for this project should cost between $0.50 and $0.75 per square foot (p.s.f.). The difference between the original bid waterproofing amount and the revised one, which reflects the decontamination proceedings, is between these figures. Specifically, plaintiff's subcontractor updated his proposal from $1.10 p.s.f., (which was plaintiff's bid price) to $1.75 p.s.f., which is $0.65 p.s.f. more. This difference between the two figures is roughly the mean of the estimates stated by defendant's expert. Consequently, the court is persuaded that plaintiff's claim for damages is accurate.

### Delay

Plaintiff's second count is for delay damages due to defendant's alleged failure to approve plaintiff's alternative waterproofing schemes. Plaintiff has only testified to damages totalling $38,400.00, which is computed as follows: $4,000.00—shed; $23,000.00—additional labor costs; $10,500.00 —backhoe; and $900.00—kerosene heaters, all totaling $38,400.00.[20]

The "Changes" clause allows plaintiff an equitable adjustment for delay damages as compensation for extended performance. *See G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 699 (1984), citing *Pathman Constr. Co. v. United States*, 227 Ct.Cl. 670, 673 (1981); *Merritt–Chapman & Scott Corp. v. United States*, 192 Ct.Cl. 848, 851, 429 F.2d 431 (1970); *Paul Hardeman, Inc. v. United States*, 186 Ct.Cl. 743, 749–52, 406 F.2d 1357 (1969). In addition, the "Changes" clause limits all claims for overhead with respect to direct costs and delay. *See Santa Fe Engineers, Inc. v. United States*, 801 F.2d 379 (Fed.Cir.1986). Plaintiff's claim is not made pursuant to this clause.

The "Suspension of Work" clause allows plaintiff an equitable adjustment for any increase in the cost of performance arising from, among other things, an act or omission by the contracting officer that delayed, suspended, or interrupted all or any part of the contract performance for an unreasonable period of time. *Beauchamp Constr. Co. v. United States*, 14 Cl.Ct. 430, 436 (1988). A constructive suspension of work results when contract performance is effectively suspended or delayed, but the CO has failed or declined to issue a stop-work order. *Id.* The court finds that plaintiff's claim properly belongs under this clause.

A primary objective of the "Suspension of Work" clause is to provide a contractual basis for compensating a contractor for government-caused delays of an unreasonable duration. *Chaney & James Constr. Co. v. United States*, 190 Ct.Cl. 699, 421 F.2d 728 (1970); *Beauchamp Constr.*, 14 Cl.Ct. at 436–37. Accordingly, the "Suspension of Work" clause is the exclusive remedy for plaintiff's delay claims based upon defendant's alleged fail-

---

**20.** Except for the backhoe and heater rental charges, plaintiff offered no cost documentation or other evidence to substantiate the sparse, and admittedly imprecise testimony, of damages offered by plaintiff's president at the trial, despite the fact that plaintiff, in its original claim for damages, asserted that "backup documentation will be furnished for all of the above enumerated delay claim charges including, but not limited to, rental contracts of equipment ... costs of shelter, payroll expenditures, payroll records showing supervisory salary expenditures." (Joint Exhibit 49.)

ure to properly direct the work. *Cf. William Green Constr. Co. v. United States,* 201 Ct.Cl. 616, 477 F.2d 930 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974); *G.M. Shupe, Inc.,* 5 Cl.Ct. at 677. Significantly, the mere fact that contract modifications have occurred is not conclusive evidence of delay or impact. *Aragona Constr. Co. v. United States,* 165 Ct.Cl. 382 (1964).

■■■■ In order to recover under the "Suspension of Work" clause, plaintiff must show that (1) contract performance was delayed; (2) defendant directly caused the delay; (3) the delay was for an unreasonable period of time; and (4) the delay injured plaintiff in the form of additional expense or loss. *John A. Johnson & Sons, Inc. v. United States,* 180 Ct.Cl. 969, 986 (1967); *Beauchamp Constr.,* 14 Cl.Ct. at 437. Plaintiff has the burden of establishing liability, causation, and resultant injury. *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345 (1969); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956 (1965). Thus, absent proof that it suffered any monetary injury as a result of a particular compensable act or omission by the VA, plaintiff is not entitled to an award of damages. *Assurance Co. v. United States,* 813 F.2d 1202, 1205 (Fed.Cir.1987). The burden of proof is upon plaintiff to establish that defendant did in fact cause delay and further that any delay adversely affected the project, entitling the plaintiff to an equitable adjustment. *See DeMatteo Constr. Co. v. United States,* 220 Ct.Cl. 579, 600 F.2d 1384 (1979); *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805 (Fed.Cir.1984); *Blinderman Constr. Co. v. United States,* 695 F.2d 552 (Fed.Cir.1982). Finally, the "Suspension of Work" clause does not define what is a reasonable or unreasonable period of delay. *DeMatteo Constr. Co.,* 220 Ct.Cl. at 579, 600 F.2d 1384. Whether a particular delay is reasonable or not depends upon the circumstances of the particular case. *Tri-Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112 (1972).

■■■ In attempting to meet its burden, plaintiff has primarily relied on the testimony of its president. He claims that defendant simply ignored the existence of the unanticipated site condition and that consequently caused the delay in the performance of the work from approximately June 1, 1983 until October of 1983. Furthermore, according to him, the work was commenced only when plaintiff decided, on its own, to perform the extra work without an equitable adjustment. The court agrees that the contract was delayed; however, plaintiff at least shared in the delay and thus cannot recover.

Plaintiff must sustain a heavy burden of proof to demonstrate that defendant caused delay, particularly in light of the delays caused solely by plaintiff. *See Koppers Co. v. United States,* 186 Ct.Cl. 142, 405 F.2d 554 (1968). Here, the contract was for 180 days. It was foreseeable to both parties at the time of contracting in May that any significant delays could push the performance of this outdoor construction contract into the heart of a New England winter. Significantly, plaintiff failed to obtain the required 10–year warranty from Grace until September 16, 1983, despite defendant's approval of Bithuthene on June 21, 1983. Nothing in the record indicates that plaintiff could not have obtained the warranty in June 1983. Defendant did not interfere with obtaining a warranty. Finally, contrary to plaintiff's testimony, the court finds that it was only after several warnings by defendant to comply with the contract that plaintiff finally decided to perform its duty to re-waterproof.

Pursuant to the "Disputes" clause of the contract, plaintiff was required to proceed with contract work even if it believed the government's actions were incorrect. *Schmid v. United States,* 173 Ct.Cl. 302, 351 F.2d 651 (1965), later proceeding 177 Ct.Cl. 1091 (1966). Thus, continued performance by plaintiff, without delay, was required. *See Penberthy Electromelt Internat'l., Inc. v. United States,* 11 Cl.Ct. 307 (1986). Considering that re-waterproofing was a critical step which prevented performance of the rest of the contract, plaintiff's inactivity was completely inap-

propriate. Furthermore, plaintiff knew that the length of the contract was only 180 days and that any significant delay would substantially affect the working conditions. In light of these points, plaintiff's failure to continue to perform was inexcusable.

Moreover, it is plaintiff's obligation to prove that all delay was defendant's fault and that the damages asserted are correct, and that the delay is correctly measured. *See Fortec Constr.,* 8 Cl.Ct. at 508. Since the delay calculations and proof here are at best speculative, and at worst, non-existent,[21] the court declines to find defendant liable.

■ Assuming *arguendo,* that defendant somehow contributed to the re-waterproofing delay in this project, nevertheless, the court finds that plaintiff's conduct in switching back and forth among types of waterproofing materials is a concurrent and substantial act of delay. The basic rule for concurrent delays is that when each party is responsible for a concurrent cause of delay, neither party can recover money from the other party. *Merritt-Chapman & Scott Corp. v. United States,* 208 Ct.Cl. 639, 528 F.2d 1392 (1976); *Commerce Internat'l. Co. v. United States,* 167 Ct.Cl. 529, 338 F.2d 81 (1964), later proceeding 173 Ct.Cl. 1193 (1965); *Blinderman Constr.,* 695 F.2d at 552. Since plaintiff is responsible for at least a concurrent cause of the delay, it cannot recover delay damages from defendant.

In consideration of all of the above, the court finds that plaintiff is not entitled to recover on Count II.

### Conclusion

For all the above reasons, plaintiff met its burden of proof and is entitled to recover on Count I of its complaint. Plaintiff failed its burden of proof on Count II.

Accordingly, the clerk is ordered to enter judgment for plaintiff in the amount of $48,584.00, plus interest as specified in the CDA, 41 U.S.C. § 611 (1982), commencing from October 3, 1983. No Costs.